ace

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-40151-01-JAR |
| | ) | |
| F. JEFFREY MILLER, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER DENYING MOTION TO REVOKE RELEASE ORDER**

This matter comes before the Court on the government's Motion to Revoke Release

Order of Magistrate Judge Sebelius (Doc. 37).  In this motion, the government objects to an

order entered by the Honorable K. Gary Sebelius, United States Magistrate Judge, on December

22, 2006, releasing defendant F. Jeffrey Miller from custody pending trial.  The Court held a

hearing on this matter on April 17, 2007.  After reviewing Judge Sebelius's ruling and the

evidence presented to this Court at the April 17, 2007 hearing, the Court is now prepared to rule.

For the reasons stated below, the government's Motion to Revoke Release Order is denied.


*Facts*

On May 17, 2006, Miller, the owner of various homebuilding companies in the Kansas

City area, was charged in a sixty-count Indictment with conspiracy, bank fraud, and engaging in

monetary transactions in property derived from the unlawful activity of bank fraud in Case No.

06-40068 ("Miller I").  On June 20, 2006, Miller entered into a Monitoring Agreement with

Meara King & Company ("the Monitor") to ensure that all of his business transactions were

conducted "in the ordinary course of business" including the requirement that "all facts relating to the transactions have been accurately disclosed to all parties to the transaction."  On June 27, 2006, Miller made his first appearance in front of Judge Sebelius.  At that time, he tested positive for cocaine, but Judge Sebelius found that while his use of cocaine was clearly inappropriate, it did not violate a condition of his release as it had occurred before such conditions were imposed.  Judge Sebelius released Miller on bond with the agreement that he would conduct his business transactions in accordance with the Monitoring Agreement.

On November 29, 2006, Miller was indicted in Case No. 06-40151 ("Miller II"), along with three co-defendants, in a twelve-count Indictment alleging conspiracy, bank fraud, engaging in monetary transactions in property derived from the unlawful activity of bank fraud, destruction of records in a federal investigation, corruptly influencing and attempting to influence a witness, and criminal contempt.[1]  At Miller's first appearance in this case, the government moved to detain him.  Afterwards, Judge Sebelius held a detention hearing that spanned five days.  On the fifth day of that hearing, December 22, 2006, Judge Sebelius denied the motion and allowed Miller's release on bond, ordering that all of Miller's business be conducted under a Revised Monitoring Agreement entered into by Miller and the Monitor.  In denying the government's motion for detention, Judge Sebelius determined that while Miller did violate the conditions of his release, this Revised Monitoring Agreement imposes conditions or a combination of conditions that will ensure the economic safety of the community.  The government now asks this Court to revoke Judge Sebelius's Order and to order Miller's

---

[1](Doc. 1.)  On December 27, 2006, a grand jury returned a Superseding Indictment in this case, adding an additional defendant and charging all defendants with harassment of witnesses in *United States v. F. Jeffrey Miller, et al.*, Case No. 06-40068-JAR.  (Doc. 39.)

detention.

### *Applicable Law*

This Court's review of the magistrate judge's decision to release defendant pending trial is *de novo.*[2]  A district court must "make its own determination if pretrial detention is proper or set conditions of release" and "ultimately decide the propriety of detention without deference to the magistrate judge's conclusion."[3]

A person who has been released under 18 U.S.C. § 3142 and who violates a condition of that release "is subject to a revocation of release, an order of detention, and a prosecution for contempt of court."[4]  18 U.S.C. § 3148(b) provides that:

> The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer—
>> (1) finds that there is—
>>> (A) probable cause to believe that the person has committed a Federal, State or local crime while on release; or
>>> (B) clear and convincing evidence that the person has violated any other condition of release; and
>> (2) finds that—
>>> (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>>> (B) the person is unlikely to abide by any condition or combination of conditions of release.

Therefore, before a court may revoke a defendant's release, it must find: "(1) that there is

---

[2]*Gee v. Estes*, 829 F.2d 1005, 1008 (10th Cir. 1987) (citation omitted).

[3]*United States v. McNeal*, 960 F. Supp. 245, 246 (D. Kan. 1997) (citing *United States v. Carlos*, 777 F. Supp. 858, 859 (D. Kan. 1991); *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990); *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987)).

[4]18 U.S.C. § 3148(a).

probable cause that the defendant committed a crime while on release or clear and convincing evidence that the defendant violated any other condition of release; and (2) that either no condition or combination of conditions will assure that the defendant will not pose a danger to any other person or the community or that the defendant is unlikely to abide by any condition or combination of conditions [of] release."[5]

In determining whether there are conditions of release that will reasonably assure the appearance of the person and the safety of any other person and the community, the judicial officer must consider the factors found in 18 U.S.C. § 3142(g). Those factors are: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.[6]

Additionally, "[i]f there is probable cause to believe that, while on release, the person committed a Federal, State, or local crime, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community."[7] Probable cause under this statute "requires only that the facts available to the judicial officer 'warrant a man of reasonable caution in the belief' that the defendant has committed a crime while on bail."[8] "Once the presumption under that section

---

[5]*McNeal*, 960 F. Supp. at 246–47 (citing *United States v. Aron*, 904 F.2d 221, 224 (5th Cir. 1990)).

[6]18 U.S.C. § 3142(g).

[7]18 U.S.C. § 3148(b).

[8]*United States v. Cook*, 880 F.2d 1158, 1160 (10th Cir. 1989) (quoting *United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986)).

comes into play, the burden of production . . . shifts to the defendant."[9]  "The burden of production is not heavy but in order to rebut the presumption, the defendant must produce some evidence."[10]  If the burden of production is met, "the presumption does not disappear, but rather remains as a factor for consideration in the ultimate release or detention determination."[11]

*Discussion*

The government contends that detention is appropriate under 18 U.S.C. § 3148(b) because there is probable cause to believe that Miller committed a crime while on release based on the evidence related to the Indictment in Miller II.  Also, the government argues that Miller deceived the Monitor by entering into business transactions that violated the Monitoring Agreement, thereby violating conditions of his release.  Further, the government argues that because there is no condition or combination of conditions that will assure that Miller will not pose a danger to any other person or the community, this Court should revoke the release order and detain Miller pending trial.

### 1.    *Probable Cause to Believe a Crime Committed While on Release*

At the April 27, 2007 hearing, the government presented evidence of conduct relating to Counts 3 and 6 of the Indictment in Miller II.  Count 3 alleges bank fraud in relation to the sale of a home in Lone Jack, Missouri to Kerrie and Jay Jordan, and  Count 6 alleges destruction of documents responsive to a grand jury subpoena.  The government presented the following

---

[9]*Id.* at 1162 (citing *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985); *United States v. Hurtado*, 779 F.2d 1467, 1478 (11th Cir. 1985)).

[10]*Id.* (citing *Dominguez*, 783 F.2d at 707; *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985)).

[11]*Id.* (citing *Jessup*, 757 F.2d at 383–84).

5

evidence regarding Count 3 through testimony by Steven Browne, a partner with Meara King & Company and the supervisor of the Monitoring Agreement, and the admission of the grand jury testimony of Sandy ("Sam") Harris, who at the time of her grand jury testimony was a government witness.[12]  On April 27, 2006, Kerrie and Jay Jordan signed a contract to purchase a home from one of Miller's businesses, Star Land & Development, Inc., for $200,000.[13]  Harris testified to the grand jury that she showed this contract to Miller and put the document into the buyer's file.  After this new home was appraised at $220,000, Harris prepared a new contract for $220,000 at the direction of Steve Vanatta, a co-defendant in Miller II.  The government proffers that the Jordans would testify that their signatures on the $220,000 contract were forged.  Also, Browne testified that the home in this transaction was given an inflated appraisal value, likely due to the fact that Harris provided the comparable properties to the appraiser, and the comparable properties were all homes built by Miller.  Browne further testified that the Jordans were encouraged to move into the home before closing, and they did so.  Harris testified to the grand jury that encouraging buyers to move in before closing was part of a strategy to raise the price of the property before closing.

However, the only evidence regarding Miller's involvement in this transaction was that Harris stated that she showed Miller the $200,000 contract.  Miller contends that the $200,000 contract was not in his files and that he had no knowledge of it.  Miller further argues that Harris's testimony here is of limited value.  Abby Powers, Miller's office manager, testified at the April 17, 2007 hearing, that Harris forged Miller's signature on checks, totaling between

---

[12]On December 27, 2006, a Superseding Indictment was filed in Miller II naming Sam Harris as an additional defendant.  (Doc. 39.)

[13](Government's Ex. 30.)

$11,000 and $12,000, payable to herself from Star Land & Development, Inc.  Also, Harris was caught on videotape at a Fashion Bug store in Lee's Summit, Missouri attempting to open a charge account using the stolen driver's license and credit card belonging to Powers.[14]

Even setting aside Harris's credibility problems, there was evidence presented by Miller that Harris generated the $200,000 contract without Miller's knowledge.  Powers testified that the $200,000 contract was atypical in that it was not signed by Jeff Miller on behalf of Star Land & Development, Inc. or Miller Enterprises; it was a one page form titled "Real Estate Contract" (a Demaree Stationary form) rather than the 11-page form titled "New Home Sale Contract" routinely used by Miller and his companies; it provides for the $8,000 down payment to be made to HCI (a company owned by Hallie Irvin, a co-defendant in Miller II), rather than to Star Land & Development, Inc. as it should have been; and it was sent from a fax number for Advahome, which is where Harris now works and that has no connection to Miller.  Also, Powers testified that the handwriting on the $200,000 contract was not Miller's handwriting.  In contrast, the $220,000 contract is on the form routinely used by Star Land & Development, Inc., is signed by Miller for Star Land & Development, Inc., and properly designates Star Land & Development, Inc. as the company to which the down payment should be made.

As to Count 6, charging destruction of records in a federal investigation, the government introduced an email dated August 31, 2006 from Harris to Powers in which Harris stated that she missed Powers at the "file cleaning party."  On the preceding day, August 30, 2006, the government prepared a grand jury subpoena to serve on Harris.  An agent with the Internal

---

[14]At the hearing before Judge Sebelius, Powers also testified, in addition to the allegations above, that Harris was involved in the disappearance of a $1,458.00 cash rent payment and that Harris is suspected of stealing prescription pain pills from Powers's purse.  At the conclusion of Powers's testimony, Judge Sebelius noted that Harris's credibility was "suspect."

Revenue Service visited Miller's office that day and had taken some files.  When Powers received Harris's email the following day regarding a "file cleaning party," Powers showed Miller the email.  Powers testified that she thought Harris was trying to be funny.  However, in front of Judge Sebelius, Powers testified that Harris's email made her uncomfortable because it sounded like obstruction of justice.  But Powers also stated that she was not aware that any documents had been destroyed nor had she ever heard Miller talk about concealing documents.

While the government argues that it has provided sufficient evidence related to Counts 3 and 6 of the Indictment in Miller II to show probable cause that Miller committed a crime while on release in Miller I, the allegations rest heavily on Harris's testimony, the credibility of which has been called into question.  However, the Court need not determine whether there is probable cause that Miller committed a crime while on release because, as shown below, the Court finds that the evidence shows that Miller violated conditions of his release, thereby satisfying the first requirement under 18 U.S.C. § 3148(b) for revocation of a defendant's release.

### 2.    *Violations of Conditions of Release*

To show that Miller violated the conditions of his release, the government points to several, different business transactions that Miller entered into contrary to the terms of the Monitoring Agreement.  At the outset, the Court notes the condition of Miller's record keeping for his businesses.  Browne described that when he first began supervising the Monitoring Agreement, Miller's records were in disarray, due to Miller's practice of keeping most of his records in his head.  When Browne began working with Miller, he found that Miller's accounting system was not complete or updated.  Miller is a self-made business person with no training in accounting or finance.  He used one assistant, Angela Parenza, to run his businesses.

8

When Browne started supervising the Monitoring Agreement, Parenza was not working for

Miller anymore, and Browne had to recreate the accounting system and put together a list of all

bank and credit card accounts for Miller.  Browne found that Miller's business records have been

in disarray for years.  Browne testified that when he initially began working on this project, he

thought that only one person would be needed to oversee the records.  However, once he

discovered the state of disarray, Browne had to expand the scope of the investigation by enlisting

four or five people to assist in the project.  Browne testified that he first had to understand the

scope of what he was monitoring and the interrelation of Miller's various companies before there

could be any monitoring of his businesses.

First, the government contends that Miller concealed from the Monitor the refinancing of

a loan made by the First National Bank of the Ozarks to Hallie Irvin, a co-defendant in Miller

II.[15]  In January 2006, prior to Miller's indictment in Miller I, Miller and Irvin purchased a

condominium unit at Regency Cove in the Ozarks.  Miller was not on the title, but he was the

guarantor of the loan.  In March 2006, Miller and Irvin agreed to rehabilitate the property and

sell it.  Afterwards, Miller was indicted in Miller I, and he entered into the Monitoring

Agreement on June 20, 2006.  This Monitoring Agreement included a reporting requirement for

transactions in excess of $50,000.  On September 30, 2006, the property was sold in trade for

two properties, one condominium unit located at Monarch Cove in the Lake of the Ozarks and

another located in Overland Park, Kansas.  No cash was transferred.  At the April 17, 2007

hearing, Browne testified that Miller orally informed him that the transfer was going to take

place, and Browne instructed Miller that the Monitor would need all of the paperwork regarding

---

[15]This loan is subject to Counts 2 and 4 of the Indictment in Miller II.

this transaction when it occurred.  However, the transaction was never disclosed to Browne until it was brought to his attention by the government.  Also, when Browne asked Miller if he signed any documents related to this property after the initial purchase, Miller stated that he had not signed any additional documents.  However, Miller signed at least four documents pertaining to the sale of the property in trade for two other properties as indicated by the promissory note, two real estate deeds of trust, and the settlement statement.[16]

Miller proffers that he did not try to hide the transaction but that he believed he did not need to report it as required by the Monitoring Agreement because there were no cash proceeds. Miller also alleges that he misunderstood Browne when he was asked whether he signed any documents related to the transfer.  Further, Miller asserts that this transaction did not dissipate any assets subject to forfeiture.  The loan on the property was paid down in connection with the trade, and a new loan was issued with the two new properties as collateral.  Miller is on the title of one of the properties; however, his name is not on the title of the other property.  Miller was surprised that his name was not on the title, and Irvin's attorney is currently adding his name on the title of this second property.

Another transaction that the government contends violated the Monitoring Agreement was a $50,000 loan that Miller made to his sister.  While reviewing documents in his capacity as supervisor of the Monitoring Agreement, Browne discovered a $50,000 "commission referral fee" paid to Todd Earnshaw, Miller's brother-in-law and also a co-defendant in Miller I, on the sale of a property for $1.2 million in Raymore, Missouri.  Browne questioned the bona fide nature of this referral fee and told Miller that he could not make the payment.  Miller told

---

[16](Government's Exs. 1–4.)

Browne that he wanted to give this money to Earnshaw to help pay for his attorney's fees in Miller I. Miller's civil attorney, Pete Smith, suggested that this payment should be more accurately recorded as a loan to his sister. About a month later, Miller loaned $50,000 to his sister, Linda Earnshaw, in exchange for a promissory note listing the Earnshaw residence, titled in Linda Earnshaw's name, as collateral for the loan. Miller never reported this loan to the Monitor, but he contends that because this was one of the first transactions subject to the Monitoring Agreement, he did not fully appreciate that this transaction needed to be reported to Browne.

The government also contends that Miller entered into a transaction in which he "structured" the transfer and sale of three properties to avoid the reporting requirement of the Monitoring Agreement. In June 2006, Stan Williams, the step-father to Miller's office manager, Abby Powers, purchased from Miller Enterprises three properties located in Kansas City, Missouri.[17] The three properties sold individually in amounts of $30,000, $40,000, and $18,000. The government contends that Miller structured the sale of these properties as separate transactions to avoid the $50,000 reporting requirement of the Monitoring Agreement. Miller asserts that each of these sales were individual transactions and that nothing was hidden. Miller proffers that Williams actually looked at four properties, but chose to buy three properties; he evaluated each property separately; he offered an independent purchase price for each property; and that Miller was free to accept or reject the price offered on each property. When Enterprise Bank made a loan to Williams for the purchase price of the properties, the bank bundled the three properties as one transaction and required Miller to pledge a CD to the bank in the amount

---

[17]The street addresses of these properties have been omitted from this Order pursuant to the District Court of Kansas Privacy Policy. D. Kan. R. CR49.14(e).

of $88,000, the amount of the loan provided to Williams.  Miller did not believe it was necessary to report the three small transactions as one collective sale.  Further, Miller contends that the purpose of the Monitoring Agreement is to ensure that Miller does not waste or deplete assets. In this case, the proceeds of the sale were converted into a CD and deposited with Enterprise Bank, and are now subject to the Court's restraining order.

Like the home in the Jordan transaction, Browne testified that he found other properties for sale by Miller with inflated appraisal values.  On December 22, 2006, the Monitor first received documents pertaining to a sale in progress of a home on Angela Road in Carl Junction, Missouri.  The initial appraisal of that home was $220,000.  Browne testified that, as occurred in the Jordan transaction, the comparable homes provided to the initial appraiser were Miller-built homes.  The Monitor conducted a review appraisal of the property that came in significantly lower at $170,000.  The Monitor also reported an inflated appraisal for a property on Windstar in Lee's Summit, Missouri.  While the initial appraisal valued the property at $195,000, the review appraisal came in lower at $175,000.  However, Browne testified that there can be honest disagreement regarding an appraisal value because of subjectivity in the process.  Browne testified that thirty-one review appraisals of Miller properties have been conducted, and there have been disagreements about eight initial appraisal values.  Out of those eight, five properties in Missouri had appraisal values that were too high, and three properties in Arizona had appraisal values that were too low.  Thus, Miller contends that there is no disagreement with the appraisals for the vast majority of the properties.  Further, Miller argues that there is no evidence that he chose the initial appraisers, but rather he contends that these appraisers were selected by the lending institutions.  However, Browne also testified that Steve Vanatta, working as a

marketer of properties, set up the appraisers; Miller contends that Vanatta was never an employee of his.

Browne testified that he found another transaction that should have been reported under the Monitoring Agreement when conducting his own database search.  Through this search, Browne learned that on August 22, 2006, Miller conveyed to Jerry Mallory property located in Gardner, Kansas.  Also on that date, Miller deeded to Mallory twenty percent of 3.5 acres of commercial property called The Meadows located in Spring Hill, Kansas.  To date, Browne has never received any documents pertaining to these transactions.  Miller orally represented to Browne that the transactions had taken place, but he does not think there are any documents and he has not been able to find any writing regarding these transactions.  Mallory told the Monitor that he thought there was a writing, but he has not been able to produce one.  The Monitor is currently working with the title company involved in the transactions to see if there are any documents in its possession.  Also, Miller proffers that he did not think that this transaction was reportable because Mallory was given two lots of property in exchange for his interest in the commercial property and paid $50,000 out of one closing, which Miller believed did not trigger the reporting requirement under the Monitoring Agreement of transactions in excess of $50,000.

Finally, the government found through its investigations another transaction that it contends violated the Monitoring Agreement.  On July 28, 2006, Miller transferred property in Carl Junction, Missouri to Sheila Irvin, mother of Hallie Irvin.  The warranty deed transferred property described as "Lot 35" from Star Land & Development, Inc. to Sheila Irvin.  However, the government contends that on May 24, 2006, Roxanne Hiser executed a contract with HCI for

the purchase of Lots 34 and 35.  The contract appears to be signed by Hallie Irvin, and Hiser

provided a $50,000 earnest money deposit payable to HCI.  After Miller transferred Lot 35 to

Sheila Irvin, she executed a $200,000 Deed of Trust with Webb City Bank encumbering Lots 34

and 35.  Then on August 1, 2006, a warranty deed was executed transferring Lot 34 from

Carlson Homes to Shelia Irvin.  It appears that Steve Carlson signed the transfer.  It is unclear

whether Carlson Homes is related to any of Miller's businesses, and the Monitor has not been

provided any documents regarding this entity.  The Monitor is currently trying to determine the

value of the transaction.  Miller has not provided documents regarding this transaction but he

proffers that he is looking for any paperwork related to the transfer and that he will provide what

he finds.  Further, Miller proffers that the total transaction would be less than $50,000 because a

typical lot in this area is valued between $16,000 to $20,000.  Thus, Miller argues that this

transaction was not reportable under the Monitoring Agreement.  Browne, however, testified that

this transaction does not make economic sense.  He expressed his concern as to the reasons why

Miller would be transferring property to the mother of a co-defendant in Miller II.[18]

Based on all of the evidence presented regarding these various transactions, there is clear

and convincing evidence that Miller violated the conditions of his release by entering into

business transactions contrary to the terms of the Monitoring Agreement.  Many of the

transactions summarized above show that Miller did not fully cooperate with the Monitor by

failing to disclose certain transactions and by failing to provide documentation.  Also, several of

the transactions should have been disclosed to the Monitor when they triggered the $50,000

reporting requirement of the Monitoring Agreement.  While Miller may have thought that he did

---

[18]However, at the time of the transaction in July 2006, Miller and Irvin had not been indicted in Miller II. The Indictment in that case was filed on November 29, 2006.

14

not need to disclose the sale of three properties, each less than $50,000, to Stan Williams, Miller

should have recognized that by pledging an $88,000 CD as collateral for Williams's loan, he had

triggered the reporting requirement.  Also, Miller engaged in several transactions that involved

the trading of property with values in excess of the reporting requirement, but Miller thought that

these transactions did not need to be reported when there were no cash proceeds.  Thus, because

Miller has violated conditions of his release, the Court must order detention if there is no

condition or combination of conditions of Miller's release that will assure that he will not pose a

danger to any other person or the community or if he is unlikely to abide by any condition or

combination of conditions of release.

### 3. *Condition or Combination of Conditions of Release*

In December 2006, when the government moved for Miller's detention before Judge

Sebelius, Miller and Meara King & Company entered in a Revised Monitoring Agreement.

Under this Revised Monitoring Agreement, the $50,000 threshold for reporting transactions has

been eliminated, and instead Miller is required to disclose all sales transactions to the Monitor.

Additionally, the Revised Monitoring Agreement authorizes the Monitor to exercise a Power of

Attorney.  Under this new agreement, Miller has signed a release giving the Monitor the ability

to operate in the same capacity as Miller so that the Monitor has unfettered access to all

information regarding Miller's various businesses.  Judge Sebelius found that with the

implementation of the new requirements of the Revised Monitoring Agreement, conditions were

imposed that will ensure the economic safety of the community and ordered Miller's release

pending trial.

Based on the evidence presented here, this Court also concludes that the Revised

Monitoring Agreement imposes conditions that assure that Miller does not pose a danger to the safety of the community.  Browne testified that under the terms of the Revised Monitoring Agreement, the Monitor has been given full and complete access by Miller to all of his business and banking records.  Miller has authorized banks to deal directly with the Monitor regarding his accounts, and the Monitor also has direct access to all credit card accounts.  Further, the Monitor has been provided authorizations from Miller's immediate family members to conduct record searches of their assets.  Browne testified that he is comfortable with the conditions imposed by the Revised Monitoring Agreement because he has access to all information, and he acknowledges that he can obtain any other information by subpoena.  Browne finds that the scope of the Revised Monitoring Agreement is better, and that he has a comfort level now that he did not have when the original agreement was in effect—the time period when all of the violations of that agreement occurred.

The Court also finds that consideration of the statutory factors under 18 U.S.C. § 3142(g) weigh in favor of release.  In considering the nature and circumstances of the offense charged, the only charge that involves allegations of threats or violence is the attempt to influence a witness.  However, there has been no evidence presented related to Miller's involvement in witness tampering.  The history and characteristics of the defendant suggest that release is appropriate.  Miller has been married for 15 years and has two minor children, ages 14 and 12. He has lived in the Kansas City area his entire life.  His parents and several siblings and their families reside there as well.  He is gainfully employed and has been his entire adult life.  He has no prior criminal record, has no history of violence, has never missed a court appearance, and has been in regular contact with his pretrial officer, who reports no violations.  Since July, Miller

16

has participated in random drug testing with Pretrial Services, and there has been no evidence of any drug use since he was released on bond on June 27, 2006.  Finally, it is unlikely that Miller's release poses danger to any person or the community when there are conditions of release, including the Revised Monitoring Agreement, that will reasonably assure the safety of the community.

Also, at this time, it appears likely that Miller will abide by these conditions. Browne testified that the Revised Monitoring Agreement has been working well in the four months that it has been in operation.  Browne stated that he has received cooperation from Miller and his civil attorney in providing open access to his records.  Miller is currently winding down his business operations and selling his assets.  He is not starting any new projects, and he is paying down his liabilities.  Miller proffers that his original loan balance of around $16 million has been paid down to about $7 million.  Miller is also trying to sell his various properties in Arizona and the Kansas City area.  Since the Revised Monitoring Agreement has been in effect, there have not been any reportable transactions.

Nevertheless, the Court has concerns about the various violations of the original Monitoring Agreement.  With many of these transactions, Miller has been unable to provide documentation because he only has records of the transactions in his head.  Browne testified that even with the full access that the Monitor has been granted under the Revised Monitoring Agreement, the Monitor still relies on the cooperation of Miller because he carries business records in his head instead of having paperwork that documents his business dealings.  Browne stated that in his own independent research, he has found at least eight transactions that occurred when the original Monitoring Agreement was in effect of which Miller failed to inform the

17

Monitor.  Browne also expressed his concern that the Monitor can never be sure of having knowledge of all transactions when there are oral agreements that Miller has made and only has record of in his head.  Although the Court recognizes these concerns, the Court does not find that detention is appropriate when the Revised Monitoring Agreement appears to be working well and provides the Monitor with full access to Miller's records.  However, while detention will not be ordered at this time, the Court cautions Miller that the Court will not hesitate to revoke his release if evidence of violations of the Revised Monitoring Agreement come to light.  Should the Monitor or the government discover any further, undisclosed transactions in violation of the Revised Monitoring Agreement, a condition of Miller's release, the Court will order Miller's detention pending trial.  Moreover, should the Monitor or the government discover that there has been any additional transactions conducted under the Revised Monitoring Agreement that have not been documented in writing, the Court will order Miller's detention pending trial.

**IT IS THEREFORE ORDERED BY THE COURT** that the government's Motion to Revoke Release Order of Magistrate Judge Sebelius (Doc. 37) is denied.

**IT IS SO ORDERED**.

Dated this __11th__ day of May 2007.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge

18