lml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Case No. 06-40151-JAR |
| | ) |
| F. JEFFREY MILLER, | ) |
| STEPHEN W. VANATTA, AND | ) |
| HALLIE IRVIN, | ) |
| | ) |
| Defendants. | ) |

<u>MEMORANDUM AND ORDER</u>

On January 22, 2009, the jury returned a special verdict against defendants F. Jeffrey Miller, Stephen Vanatta and Hallie Irvin on the Forfeiture Notice in the Indictment directing a money judgment against defendants and that defendants' interests in certain property be forfeited as the proceeds of various crimes. This matter is now before the Court on the following motions: Motion for Preliminary Order of Forfeiture and Imposition of Forfeiture Judgment as to the respective defendants (Docs. 366, 367, 368); defendant Miller's Motion to Vacate Forfeiture Verdicts (Doc. 322); defendant Miller's Motion to Stay Seizure and Disposition of Property Prior to Sentencing (Doc. 334); and defendant Miller's Supplemental Memorandum on Forfeiture and Provisional Request for Release of Funds (Doc. 398). Defendants Vanatta and Irvin have joined in defendant Miller's motions (Docs. 330, 333). A hearing was held on August 10, 2009, at which time the Court granted defendants' motions to join and took the remaining matters under advisement. The Court has reviewed the record and the parties' submissions and is ready to rule. For the reasons explained below, defendant's motion to vacate is granted in part and denied in part; the motion to stay seizure and disposition of property is denied, without

prejudice; and the request for release of funds is granted.

I.     **Procedural Background**

Defendants were charged with conspiracy to engage in bank fraud and money laundering as well as substantive bank fraud, money laundering, contempt and obstruction charges.  After a jury trial, defendants Miller, Vanatta and Irvin were found guilty of conspiracy to commit bank fraud in violation of 18 U.S.C. § 371 (Count 1); money laundering in violation of 18 U.S.C. § 1957 (Count 5); and two counts of contempt in violation of 18 U.S.C. § 3148 (Counts 9 and 10).[1] Defendants Vanatta and Irvin were also found guilty of bank fraud in violation of 18 U.S.C. 1334 (Count 2) and money laundering (Count 4).[2]  For purposes of forfeiture, the relevant counts of conviction are Counts 1, 2, 4 and 5.

The government sought forfeiture under 18 U.S.C. § 982(a) of the following assets:

- a sum in excess of $5,000,000;

- all assets and accounts whatsoever of Miller Enterprises, Star Land Development, Dutch Custom Homes, HCI, Innovative Designs, and any other entities however organized, which the defendants Miller, Vanatta, or Irvin, own or control or over which they have signature or signatory authority;

- a residence at 415 Regency Cove, Lake Ozark, Missouri, and/or any proceeds or property derived from any divestiture of this property;

- a 1998, 45-foot Sea Ray boat, VIN - Hull I.D. #SERP4077D898, known

---

[1](Docs. 318, 319, 320.)  A fourth defendant, Sandra Harris, was acquitted of all charges (Doc. 321.)

[2]*Id.*

2

as the "Bling Bling";

- a 2006, 50+ foot Sea Ray boat, Hull I.D. #SERY1272D506, known as the "Pipe Dream"; and

- a 1998 Piper Seneca V Aircraft, Serial No. 34-49073, Reg. No. N4129N

The defendants opted to have the jury determine both the amount of the money judgment and whether the government has established the requisite nexus between the property and the offenses committed.[3]  On January 20, 2009, the government presented additional evidence in support of forfeiture, and on January 21, 2009, the jury returned particularized special verdicts against each defendant.[4]  The Court included interrogatories asking the jury to identify from which offense or offenses the forfeited property was derived from or involved in or traceable to, giving options tailored to each defendant's offenses of conviction: (1) conspiracy and/or bank fraud and (2) money laundering.[5]  With respect to all defendants, the forfeiture verdict involved a $2.67 million money judgment and the Seneca aircraft.[6]  With respect to defendant Miller, the forfeiture verdict also involved all assets and accounts of Star Land Development and the Pipe Dream boat.[7]  With respect to defendants Vanatta and Irvin, the foreiture verdict also involved all assets and accounts of HCI and Innovative Designs, 415 Regency Cove, and the Bling Bling boat.[8]

---

[3]Fed. R. Crim. P. 32.2(b)(4).

[4](Docs. 325, 326, 327.)

[5]*Id.*

[6]*Id.*

[7](Doc. 325.)

[8](Docs. 326, 327.)

Shortly after the post-trial motions were filed, co-defendant Vanatta moved to withdraw William Rork as counsel.  The Court reluctantly granted Vanatta's motion and Patrick Berrigan was appointed on April 8, 2009.  At a status conference held April 15, 2009, Berrigan requested and was granted ninety days additional time to review the post-trial motions and to file additional motions, including a response to the government's Motion for Preliminary Order of Forfeiture.  Yet no additional submissions or arguments were made on behalf of defendant Vanatta prior to or during the hearing held August 10, 2009.

## II.    Applicable Law

Defendant Miller moves pursuant to Fed. R. Crim. P. 29(c), to set aside the special forfeiture verdicts with respect to both the money judgment and the forfeited items on the grounds that the verdicts are inconsistent with the evidence presented at trial and must fail as a matter of fact and law.  As Miller notes, the forfeiture verdicts may also be impacted by the pending Rule 29 motions for judgment of acquittal.[9]  For purposes of this motion only, the Court will assume that there is sufficient evidence on the underlying crimes, and will rule on those pending motions in a separate order.[10]

In reviewing a motion for judgment of acquittal, the court views the evidence in the light most favorable to the government.[11]  The court must uphold a jury's guilty verdict if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[9](Docs. 253, 280, 281, 329, 331, 332.)

[10]A hearing on the pending motions was also held August 10, 2009, at which time the Court took the matters under advisement.

[11]*United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir.1999) (citation omitted).

4

doubt.'"[12]  However, since the preponderance of the evidence standard applied to the forfeiture proceedings, the Court finds that this standard, as opposed to the reasonable doubt standard, should apply.[13]  Thus, the Court must inquire as to whether the evidence is sufficient to permit a reasonable jury to conclude that the government has proven, by a preponderance of the evidence, that certain property is subject to forfeiture.

Criminal forfeiture, as an aspect of sentencing, does not require proof beyond a reasonable doubt.[14]  Rather, after a defendant is convicted, the government must establish that the money or property at issue is subject to criminal forfeiture only by a preponderance of the evidence.[15]  The jury was instructed that a preponderance of the evidence means proof that something is more likely true than not true.[16]

In this case, the government sought forfeiture pursuant to 18 U.S.C. § 982(a)(1) and (2). Under § 982(a)(1), property is subject to forfeiture if it was involved in or traceable to property involved in an offense for which defendant has been convicted, in this case money laundering as charged in Counts 4 and 5.  Section 982(a)(2) provides that money or property is subject to forfeiture if it constitutes or is derived from proceeds that the defendant obtained, directly or indirectly, as the result of at least one of the offenses for which defendant has been found guilty, in this case bank fraud as charged in Count 2 or conspiracy to commit bank fraud as charged in

---

[12]*United States v. Haber*, 251 F.3d 881, 887 (10th Cir. 2001) (quoting *United States v. Schluneger*, 184 F.3d 1154, 1158 (10th Cir. 1999)).

[13]*United States v. Loe*, 49 F. Supp. 2d 514, 517 (E.D. Tex. 1999).

[14]*See Libretti v. United States*, 516 U.S. 29, 49 (1995).

[15]*Id.*

[16]Supplemental Forfeiture Jury Instruction No. 5 (Doc. 324.)

Count 1.  As the Court explained in its supplemental forfeiture instructions to the jury, property

"derived from" the proceeds of an offense means money or other property obtained by the

defendant directly or indirectly using money or any other source of wealth gained as a result of

the offense.[17]  Property "involved in" an offense includes the money or other property being

laundered, any commissions or fees paid to the launderer, and any property used to facilitate the

laundering offense.[18]  Property "traceable to" means property where the acquisition is

attributable to the offense for which the defendant has been found guilty, rather than from

untainted sources.[19]

## III.    Evidence

At the forfeiture trial, the government presented summary charts of home sales the

government alleged were implicated in the conspiracy.[20]  Agent Glaser testified that proceeds

from the home sales typically flowed two in directions: (1) loan amounts were transferred at

closing to pay off the mortgage lien held by the respective bank that held the construction loan

on the house; and (2) net proceeds were transferred to a Star Land operating account at Hillcrest

Bank for Loan Jack homes, or Arvest Bank for Carl Junction homes.  Agent Glaser testified that

net proceeds generated by the pertinent home sales was $581,441.30, as referenced in the

government's demonstrative flow chart.[21]

Agent Glaser testified that transfers occurred from the Hillcrest operating account and

_____

[17]Supplemental Forfeiture Jury Instruction No. 3 (Doc. 324.)

[18]*Id.*

[19]*Id.*

[20]Forfeiture Exs. A, A-1.

[21]Forfeiture Ex. A-2.

Arvest Bank account to an account at First National Bank of the Ozarks ("First National Bank"). Glaser did not testify about the amounts or dates of transfers between accounts, and no evidence was offered to establish that information, as conceded by the government at the August 10, 2009 hearing.

The government produced evidence that the Pipe Dream was purchased in April 2006, with a $350,000 trade-in and a $152,000 payment from an account at First National Bank.[22] The balance of the amount owed on the boat was financed by a secured loan from Bank of America.[23] Four payments on the boat loan, totaling $19,019.15, were made in May, September, October and November 2006, from the Hillcrest operating account.  Agent Glaser testified that the October and November payments occurred after the home sales alleged to be part of the conspiracy, and that between May and September 2006, only one home sale could have deposited funds into the Hillcrest operating account—in July of 2006.  The government did not offer any evidence of such a deposit.

The government presented similar evidence concerning the Piper Seneca aircraft.  In March 2006, Go Aviation, a company owned by defendants Miller and Vanatta and a third individual, who was a pilot, agreed to purchase the aircraft.[24]  Another plane was traded in and First National Bank provided a secured loan of $250,000 to generate additional cash for the purchase.[25]  With respect to defendant Miller, the government offered evidence that two loan

---

[22]Forfeiture Ex. E.

[23]Forfeiture Ex. E-2.

[24]Forfeiture Exs. F, F-1.

[25]Forfeiture Ex. F-2.

payments of $2600.00 each were made from the Star Land account at First National Bank in May and August 2006.[26]  The government also offered evidence that other loan payments approximating $18,000 were made by "HCI-Hallie Irvin" from the Commerce Bank account.[27]

The government also presented evidence about HCI, Innovative Designs, the Bling Bling boat,[28] and 415 Regency Cove,[29] which the jury did not forfeit concerning defendant Miller, and which he does not address in his Rule 29 motion.  Although they joined in Miller's motion to the extent it applied to them,[30] neither defendant Vanatta nor Irvin filed a separate motion addressing these specific properties, and the Court considers any argument with respect to forfeiture of those assets waived.

## IV.    Discussion

### A.    Rule 29

Defendant Miller objects to the special verdict of forfeiture with respect to the money judgment, and three specific items; defendants Vanatta and Irvin join as to those arguments that apply to them.  The Court will address each item in turn.

---

[26]Forfeiture Ex. F-4.

[27]*Id.*

[28]Trial Exs. 2-A, 2A-1; Forfeiture Ex. D-2

[29]Trial Exs. 2-E, 9-2A, 9-3, 9-5.

[30](Docs. 330, 333.)

1.      **Money Judgment**

As defendant concedes, it is gross receipts that are considered forfeitable under federal forfeiture statutes invoking the term "proceeds."[31]  Nevertheless, defendant argues that "proceeds" under § 982(a)(2) must be interpreted as "profits" pursuant to a recent decision by the United States Supreme Court, and thus the money judgment should be reduced to reflect net proceeds.  In *United States v. Santos*,[32] the plurality opinion concluded that the term "proceeds" in the federal money laundering statute, 18 U.S.C. § 1956(a)(1), means "profits" rather than "receipts."[33]  Defendant Miller argues that the *Santos* definition of proceeds as profits applies to the money judgment verdict, which was based on his conviction of conspiracy to commit bank fraud because 1) the rule of lenity dictates that this Court adopt a net proceeds definition in the forfeiture context, and 2) the circumstance of this case creates a "merger problem."  The government responds that the *Santos* decision is limited to its facts.

The defendant in *Santos* was operating an illegal lottery.  The transactions underlying his money laundering convictions were payments to his employees and payments to lottery winners.[34]  A plurality of four justices determined that "proceeds" always means "profits."[35]  Justice Scalia, writing for the plurality, argued that there was nothing in the statute to indicate whether "proceeds" meant "profits" or "gross receipts."  Because "[t]he rule of lenity requires

---

[31]*See, e.g., United States v. Keeling*, 235 F.3d 533, 537 (10th Cir. 2000) (involving proceeds in 18 U.S.C. § 853, which is incorporated by reference in § 982(b)(1)).

[32]—U.S.—, 128 S. Ct. 2020 (2008).

[33]*Id.* at 2024.

[34]*Id.* at 2022-23.

[35]*Id.* at 2025.

ambiguous criminal laws to be interpreted in favor of the defendants subjected to them," Justice Scalia contended that the Court should adopt the more "defendant-friendly" rule that the statute only forbids laundering of profits.[36]   The plurality also found its conclusion to be justified because it allows the money laundering statute to avoid the "merger problem."[37]   Justice Stevens concurred with this plurality to form a majority, but he determined that the Court "need not pick a single definition of 'proceeds' applicable to every unlawful activity. . . ."[38]   He concluded that "proceeds" must mean "profits" where the transactions in question involved "revenue generated by a gambling business that is used to pay the essential expenses of operating that business . . ."[39]

     The question for this Court is whether the *Santos* definition of "proceeds" as "profits" extends to the forfeiture provisions of § 982.   *Santos* is a case in which "no single rationale explaining the result enjoys the assent of five Justices."[40]   In the absence of a majority opinion, the Supreme Court has instructed that the holding of *Santos* is the "position taken by [that] member[ ] who concurred in the judgment on the narrowest grounds."[41]   Thus, under the *Marks* test, the narrow holding of *Santos* is limited to the position taken by Justice Stevens—that "proceeds" means "profits" in cases in which the specified unlawful activity in a charge of

---

[36]*Id.*

[37]*Id.* at 2026 ("If 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts. . . Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries . . . would 'merge' with the money laundering statute.").   According to the plurality, "[t]he merger problem is not limited to lottery operators" because most crimes involve costs, which may be paid after-the-fact using monies acquired from the crime. *Id.* at 2026-27.   "Interpreting 'proceeds' to mean 'profits' eliminates the merger problem." *Id.* at 2027.

[38]*Id.* at 2033 (Stevens, J., concurring).

[39]*Id.*

[40]*Marks v. United States*, 430 U.S. 188, 193 (1977).

[41]*Id.*

money laundering is illegal gambling.  According to Stevens, his decision to concur in the judgment was based on two factors: (1) the lack of legislative history relevant to unlawful lottery cases and (2) the "perverse result" created by the merger problem if the "gross receipts" definition is applied to illegal gambling cases.[42]

Defendant Miller cites to *United States v. Levesque*[43] as authority from the First Circuit Court of Appeals that *Santos* warrants reconsideration of the long-standing application of gross proceeds to forfeiture.  That case does not offer this Court guidance on the issue, however, as the parties consented to a remand to have the district court consider in the first instance whether and to what extent the ruling in *Santos* affected the foreclosure determination in that case.[44]  Lower courts addressing the issue have declined to extend *Santos* to forfeiture statutes.  In *United States v. Peters*,[45] the court limited the ruling in *Santos* to its facts and declined to extend the definition of proceeds as profits to forfeiture proceedings brought under § 982(a)(2).  Likewise, the court in *United States v. Caprotta*,[46] held that even after *Santos*, "proceeds" refers to gross receipts in forfeiture proceedings brought under § 853.[47]  The court noted the lack of a merger problem, explaining,  "[t]o become subject to a forfeiture under § 853, a defendant has to be convicted of a

---

[42]*Santos*, 128 S. Ct. at 2034 n.7 (Stevens, J., concurring) (clarifying that his conclusion "rests on my conviction that Congress could not have intended the perverse result that the dissent's rule would produce if its definition of 'proceeds' were applied to the operation of an unlicensed gambling business.  In other applications of the statute not involving such a perverse result, I would presume that the legislative history summarized by Justice Alito reflects the intent of the enacting Congress.").

[43]546 F.3d 78 (1st Cir. 2008).

[44]*Id.* at 82-83.  To date, the district court has not entered an order on this issue or resentenced after remand.

[45]257 F.R.D. 377, 388 (W.D.N.Y. Mar. 19, 2009).

[46]571 F. Supp. 2d 195 (D. Me. 2008).

[47]*Id.* at 199-200.  Section 982(b)(1) expressly incorporates § 853.

predicate crime under Title 21 and, upon such a conviction, § 853 simply assures that a drug dealer is deprived of the economic power generated by illegally derived wealth."[48]  The court went on to discuss the legislative history of the Crime Control Act of 1984, stating that "[c]ongress explained that it used 'proceeds' in the RICO forfeiture statute . . . 'in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits. It should not be necessary for the prosecutor to prove what the defendant's overhead expenses were.'"[49]

Given the nature of the *Santos* opinion, the Court disagrees with defendant that it should be extended to the definition of proceeds in the context of forfeiture, particularly in light of the fact that the predicate offense for the forfeiture verdict did not involve the money laundering statute.[50]  Because proceeds means gross receipts, defendants have failed to meet their burden to show that no reasonable jury could have reached this verdict by a preponderance of the evidence. Consequently, the Court denies defendants' motion to vacate the money judgment verdict on these grounds.

---

[48]*Id.*

[49]*Id.* at 200 & n.8 (quoting S. Rep. No. 98-225, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3382) (noting that using the legislative history for the RICO forfeiture provisions is consistent with the First Circuit's earlier conclusion that the RICO forfeiture and drug-related forfeiture statutes should be construed "*in pari passu.*").

[50]In so ruling, the Court recognizes that defendants have also argued for application of *Santos* in dismissal of substantive Count 5, as the government's basis for Count 5 fails the standard announced in *Santos* for money laundering. Lower courts have reached varied conclusions about the holding in *Santos* with respect to substantive money laundering charges.  Although the Court instructed the jury that proceeds means profits with respect to the substantive money laundering counts (Doc. 316, Instruction No. 25), it intends to fully address defendants' arguments and the issue in the context of the post-trial motions pending on the substantive counts.

2.      **Star Land Development**

During closing arguments, without informing the Court or defense counsel beforehand, the government put a prototype of the special verdict form on the ELMO projector and directed the jury's attention to each item listed for which the government sought forfeiture.  With respect to items II, III and IV, all assets and accounts of Miller Enterprises, Star Land Development and Dutch Custom Homes, respectively, the government explained that the Indictment had been brought before the monitoring agreement with respect to defendant Miller was in place and that the government now believed that the assets and accounts of those three entities were in essence, "cleansed," and thus the government was not asking the jury to consider any of the listed assets that were being monitored until item V, HCI.  The government drew a circle around these three items in the verdict form with a red marker and x'd the items out.  The jury did not find that the assets and accounts of Miller Enterprises or Dutch Custom Homes were subject to forfeiture, but did find so with respect to the assets and accounts of Star Land Development, although with respect to defendant Miller only.[51]

Defendant Miller argues that the government conceded that the jury should not forfeit the assets and accounts of Star Land Development, and thus the verdict must be vacated.  The government responds that its statement in closing argument was merely "a suggestion to help the jury navigate the forfeiture instruction evidence," and that the jury chose to disregard the prosecutor's suggestion.  The Court disagrees with the government's characterization of the prosecutor's statements to the jury.  Unlike the assertions and arguments made in support of forfeiture of the other items, the government specifically stated that there was an insufficient

---

[51](Doc. 325.)

basis to support the forfeiture of all assets of Star Land Development and the other two companies, as they had been "cleansed" by the monitor.

Moreover, the government's evidence did not support the jury's finding of a nexus between the conspiracy to commit bank fraud and "all assets and accounts of Star Land Management." Agent Glaser testified that the Hillcrest and Arvest accounts held by Star Land Development received proceeds from other business activities not implicated in the present case or pertinent to the homes at issue in the conspiracy. He also testified that Star Land Development and defendant Miller were involved in substantial construction and development work beyond the homes involved in this case and those companies used a number of accounts, none of which were discussed or involved with identified deposits or transfers. Because forfeiture laws protect untainted assets, and Agent Glaser agreed and the government conceded that Star Land Development accounts had been cleansed, the Court grants defendant Miller's motion to vacate this aspect of the verdict.

### 3.      Pipe Dream

The jury found that the Pipe Dream boat both (1) constituted or was derived from proceeds obtained directly or indirectly as a result of conspiracy to commit bank fraud in Count 1 and (2) was involved in or traceable to the offense of money laundering in Count 5.[52] Defendant Miller argues that the government failed to prove by a preponderance of the evidence the nexus between the property and either offense of conviction.

#### *Conspiracy to Commit Bank Fraud*

The government contends that any item that was funded, in whole or in part, through

---

[52](Doc. 325.)

payments from Miller's account at Hillcrest Bank and First National Bank constitutes "proceeds" of conspiracy to commit bank fraud because the $5.3 million in proceeds from the fraudulent home sales flowed into those bank accounts and through to his assets, including the Pipe Dream. Miller argues that the government failed to establish a sufficient nexus between the acquisition of the boat and proceeds generated by the conspiracy to commit bank fraud. Alternatively, Miller argues that the evidence of loan payments on the boat being made from the Hillcrest operating account fails to justify forfeiture of the entire vessel, and the verdict should be limited to either the four payments, $19,019.15, or only the May and September payments, $7603.66, based on Agent Glaser's testimony that the October and November payments occurred after the home sales alleged to be part of the conspiracy.

The Court agrees with defendant Miller that the government's evidence does not support forfeiture of the entire Pipe Dream boat. As the government conceded at the August 10, 2009 hearing, there is no evidence linking the First National Bank account to proceeds generated by the conspiracy to commit bank fraud. Because the boat was acquired by way of a trade-in and down payment from First National Bank, the government failed to prove that acquisition of the boat was derived from illegal proceeds. Instead, the government's proof established that four payments totaling $19,019.15 used as loan payments for the boat came from the Hillcrest operating account deemed to have been tied to the conspiracy to commit bank fraud. Agent Glaser conceded that the October and November payments occurred after the home sales alleged to be a part of the conspiracy. Because the preponderance of the evidence does not support the jury's forfeiture of the entire boat, the Court will reduce the verdict to reflect the amount actually expended from the Hillcrest account to service the debt obtained to purchase the boat, or

15

$7603.66.

### *Money Laundering*

In order to justify forfeiture of the Pipe Dream as proceeds of the money laundering offense of conviction in Count 5, the government must show that the Pipe Dream was "involved in" the construction loan pay-off from the Kerrie Jordan home sale, or traceable to the construction loan pay-off from the Kerrie Jordan home sale.  The Court finds that no evidence offered by the government suggested that the boat was somehow involved in the money laundering alleged in Count 5, nor did the government attempt to trace the property to the construction loan pay-off that was the basis for the money laundering offense in Count 5.[53]  The Court grants defendant's motion to vacate this basis for the forfeiture verdict of this asset.

### 4.      Piper Seneca

The jury found that the Piper Seneca plane both (1) constituted or was derived from proceeds obtained directly or indirectly as a result of conspiracy to commit bank fraud in Count 1 and (2) was involved in or traceable to the offense of money laundering in Count 5.[54]  The jury also found with respect to defendant Vanatta that the plane constituted or was derived from proceeds obtained as a result of bank fraud in Count 2 and money laundering in Count 4.[55]  Defendant Miller argues that the government failed to prove by a preponderance of the evidence the nexus between the property and either offense of conviction.

---

[53]*See United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (explaining that property "traceable to" means property where the acquisition is attributable to the offense rather than money from untainted sources).

[54](Doc. 325.)

[55](Doc. 326.)

### *Conspiracy to Commit Bank Fraud*

Similar to the Pipe Dream, the Piper Seneca airplane was acquired by way of another plane being traded and a cash payment being made.  First National Bank provided a secured loan of $250,000 to generate the acquisition cash for the airplane.  Defendant argues that the government's evidence failed to link the First National Bank account to any proceeds of the conduct alleged in Count 1.  Defendant also argues that the verdict should be limited to the two loan payments of $2600 each from the Star Land Development account at the bank in May and August of 2006.

The Court also agrees with defendant Miller that the government's evidence does not support forfeiture of the entire Piper Seneca aircraft.  As the government conceded at the August 10, 2009 hearing, there is no evidence linking the First National Bank account to proceeds generated by the conspiracy to commit bank fraud.  Because the plane was acquired by way of a trade-in and loan for the balance from First National Bank, the government failed to prove that acquisition of the plane was derived from illegal proceeds.  Instead, the government's proof established that two payments used as loan payments for the plane came from the Star Land account at Hillcrest bank deemed to have been tied to the conspiracy to commit bank fraud.  The government also offered evidence that eight loan payments for the plane came from the HCI-Hallie Irvin account at Commerce Bank; evidence at trial established that the funds that went through HCI and its bank accounts were also proceeds of the conspiracy to commit bank fraud.  Because the preponderance of the evidence does not support the jury's forfeiture of the entire plane, the Court will reduce the verdict to reflect the amount actually expended from the Hillcrest and Commerce accounts to service the debt obtained to purchase the plane, or

$24,086.23.

### *Money Laundering*

As with the Pipe Dream, the Court finds that no evidence offered by the government suggested that the Piper Seneca aircraft was somehow involved in the money laundering alleged in Counts 4 and 5, nor did the government attempt to trace the property to the distribution of loan proceeds or the construction loan pay-off that were the bases for the money laundering offenses. The Court grants defendant's motion to vacate this basis for the forfeiture verdict of this asset.

### B.    Excessive Fine

The Court acknowledges that the forfeiture in this case is substantial.  A criminal forfeiture is unconstitutionally excessive under the Eighth Amendment if it is grossly disproportionate to the gravity of the offense.  In determining whether a forfeiture is grossly disproportional, a court evaluates the following: (1) the essence of the defendant's crime and its relation to other criminal activity; (2) whether the defendant fits into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the unlawful conduct.[56]  Defendant Miller argues these factors suggest the present forfeiture verdicts are excessive because the jury was instructed to forfeit gross proceeds of the conspiracy, the jury forfeited all accounts and assets of Star Land, which had significant business activities unrelated temporally and substantively to the transactions in this case, and the jury forfeited the Pipe Dream and the Seneca aircraft, despite an insufficient nexus to any criminal conduct.

At the August 10, 2009 hearing, the government  provided the Court and defense counsel

---

[56]*United States v. Bajakajian*, 524 U.S. 321, 337 (1998).

with additional case law where several courts of appeal concluded since *Bajakajian* that the forfeiture of proceeds does not implicate the Eighth Amendment concerns of disproportionality.[57] The Court does not reach this question, however, because even assuming the Eighth Amendment does apply, the Court finds that application of the *Bajakajian* factors results in a finding that the forfeiture here is not an excessive fine.

As discussed above, the Court grants defendant Miller's motion for verdict on the Star Land forfeiture verdict and declines to forfeit the entire boat and airplane, reducing the forfeited interest in that property significantly. But the Court rejected defendant's argument that net profits rather than gross receipts, is the proper amount to be forfeited. Defendant was convicted of a comprehensive criminal conspiracy involving bank fraud over a period of two years, causing over $5 million in mortgages to be funded for homes purchased by unqualified buyers. Although the government sought forfeiture of over $6.4 million dollars of these proceeds, the jury opted for a figure of less than half that amount. The government presented evidence at trial that defendants were fully engaged in the criminal conspiracy for which they were convicted. The penalties for defendants' conduct also demonstrate the seriousness of the offenses. The maximum statutory penalty for the conspiracy offense alone, is 30 years imprisonment and a $1,000,000 fine.[58] Finally, both the banks and the homeowners suffered harm as a result of defendants' criminal conduct; of the twenty-nine transactions involved in the conspiracy to

---

[57]*See, e.g.*, *United States v. Betancourt*, 422 F.3d 240, 250 (5th Cir. 2005) (drug trafficking proceeds); *United States v. 22 Santa Barbara Drive*, 264 F.3d 860, 874-75 (9th Cir. 2001) ("Because criminal proceeds represent the paradigmatic example of 'guilty property,' the forfeiture of which has been traditionally regarded as non-punitive, we follow the Seventh, Eighth and Tenth Circuits and held that the excessive fines clause of the Eighth Amendment does not apply to a forfeiture action brought under 21 U.S.C. § 881(a)(6).").

[58]18 U.S.C. § 371.

commit bank fraud, nineteen have gone into foreclosure, and many of the buyers have lost their homes. Given these facts and circumstances, the Court finds that the remaining money judgment of $2.67 million and limited forfeiture of the plane and boat is not grossly disproportionate to the gravity of the criminal activity alleged by the government.

### C.      Stay of Seizure

The government has moved for Preliminary Orders of Forfeiture against the respective defendants, forfeiting the property described above and ordering the United States Department of the Treasury to seize and maintain custody of the forfeiture property and dispose of it in accordance with the law. Defendant Miller has moved to stay seizure and disposition of the property, arguing that counsel has been working with the government to coordinate a "certain procedure" for addressing the present forfeiture issues. Miller requests the Court exercise its discretion to preclude seizures pursuant to Fed. R. Crim. P. 32.2(d), when such action would potentially work a severe prejudice on a party and any appellate relief would not restore the party to any level of adequacy.

Rule 32.2(d) provides that the court may stay an order of forfeiture pending appeal. "The purpose of the provision is to ensure that the property remains intact and unencumbered so that it may be returned to the defendant in the event the appeal is successful."[59] There is nothing in this provision authorizing the Court to stay seizure of the property subject to forfeiture.[60] Defendant's motion is denied, without prejudice, to renew pending an appeal.

_____

[59]Fed. R. Crim. P. 32.2(d) Advisory Committee Notes (2000).

[60]*See* Fed. R. Crim. P. 32.2(b)(3) (entry of a preliminary order of forfeiture authorizes the Attorney General to seize the specific property subject to forfeiture). That provision stops short of authorizing the government to dispose of the property.

### D.      Request for Release of Funds

During the pendency of the forfeiture motions, an escrow account was established to hold funds generated by sales of assets.  The Piper Seneca aircraft was sold and the proceeds totaling $130,520.39 were deposited into the escrow account.  A residence owned by defendant Miller and his wife was sold and the net proceeds of $39,749.80 were deposited into the escrow account.

Defendant Miller moves the Court to release the proceeds from the sale of his residence for payment on accrued legal fees in these criminal proceedings.[61]  Miller also requests the Court order the release of the net proceeds from the sale of the Piper Seneca aircraft, to satisfy his accrued financial obligation for legal fees in this case as well as accrued monitoring fees due to the Meara firm and to make personal payments on his residence and credit card debts.

The Court has previously ruled that the government is not entitled to forfeiture of the entire aircraft, but instead, is limited to the loan payments made from accounts linked to the conspiracy to commit bank fraud convictions.  As acknowledged by the government at the August 10, 2009 hearing, it would seek to recover any excess proceeds as substitute assets.  Likewise, the proceeds from the sale of the residence also constitute substitute assets.  Because the government is prohibited from prior restraint of substitute assets,[62] the Court will grant defendant's motion for release of funds, with $24,086.23 of proceeds from the sale of the plane

---

[61]As counsel Jeffrey Morris clarified at the hearing, he is retained by defendant Miller in the present criminal proceedings, but has been appointed in the related criminal proceedings in Case No. 06-40068.

[62]*See United States v. Jarvis*, 499 F.3d 1196, 1204 (10th Cir. 2007) (holding the government does not have a ripened interest in 21 U.S.C. § 853(p) substitute property until (1) after defendant's conviction and (2) the court determines the defendant's § 853(a) forfeitable property is out of the government's reach as enumerated in § 853(p)(1)(A)-(E)).

to remain in escrow.  The Court declines, however, to direct how defendant shall utilize these proceeds, trusting he will work with defense counsel to satisfy his obligations as set forth in the motion.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Miller's Motion to Vacate Forfeiture Verdicts (Doc. 322) is GRANTED in part and DENIED in part;

**IT IS FURTHER ORDERED** that the government's Motions for Preliminary Orders of Forfeiture (Docs. 366, 367, 368) are GRANTED; the Court will enter separate Preliminary Orders of Forfeiture as to each defendant reflecting the findings set forth herein.  Defendant Miller's Motion to Stay Seizure and Disposition (Doc. 334) is DENIED without prejudice.

**IT IS FURTHER ORDERED** that defendant Miller's Provisional Request for Release of Funds (Doc. 398) is GRANTED.

IT IS SO ORDERED.

Dated:  September 10, 2009

                                                   S/ Julie A. Robinson
                                                  JULIE A. ROBINSON
                                                  UNITED STATES DISTRICT JUDGE