lml

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 06-40151-JAR** |
| | ) | |
| **F. JEFFREY MILLER and** | ) | |
| **HALLIE IRVIN,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

On January 11, 2010, a bifurcated sentencing hearing was held in this matter.  As

directed prior to the hearing, the Court heard evidence and argument on the parties' objections to

the Presentence Investigative Report ("PSIR").   The Court took the matters under advisement.

The government subsequently moved for a new PSIR with respect to defendant F. Jeffrey Miller

(Doc. 451), and defendant has objected.  The Court has reviewed the evidence and submissions

and now issues the following statement of reasons memorializing its ruling on objections to the

PSIR.

I.      **Background**

The underlying facts of this case are recited in the Court's Orders ruling on defendants'

post-trial motions with respect to both the substantive counts and forfeiture.[1]  The Court

incorporates those Orders herein and relies upon them by reference in ruling on the instant

objections.  The Court will not restate its findings in detail, except as necessary to explain the

_____

[1](Docs. 406, 421.)

Court's ruling.

In May 2006, the government filed its initial Indictment in *United States v. Miller*, Case No. 06-40068 ("*Miller I*"), charging Miller and others with a conspiracy to commit bank fraud and money laundering beginning in 1997 and continuing through the Indictment. Subsequently, the present action was filed ("*Miller II*"), which proceeded to trial first. On December 18, 2008, a jury found defendants F. Jeffrey Miller, Stephen Vanatta[2] and Hallie Irvin guilty of conspiracy to commit bank fraud in violation of 18 U.S.C. § 371 (Count 1); money laundering in violation of 18 U.S.C. § 1957 (Count 5); and two counts of contempt in violation of 18 U.S.C. § 3148 (Counts 9 and 10).[3] Defendants Vanatta and Irvin were also found guilty of bank fraud in violation of 18 U.S.C. § 1334 (Count 2) and money laundering (Count 4).[4] The Court upheld the verdicts on all counts.[5] The government sought and obtained forfeiture under 18 U.S.C. § 982(a)(2), and the Court has entered Preliminary Orders of Forfeiture[6] and Amended Preliminary Order of Forfeiture.[7]

## II.     PSIR

The base level offense is 7.[8] Both defendants received a 14-level increase for amount of

---

[2]Stephen Vanatta died on December 21, 2009, and the Indictment was dismissed January 11, 2010 (Doc. 446.)

[3](Docs. 318, 319, 320.) A fourth defendant, Sandra Harris, was acquitted of all charges (Doc. 321.)

[4](Docs. 319, 320.)

[5](Doc. 421.)

[6](Docs. 407, 409.)

[7](Doc. 431.)

[8]U.S.S.G. § 2B1.1.

loss in the amount of $588,247.61.[9]  Both defendants received a 2-level increase because they victimized more than ten victims,[10] a 2-level increase because the offense involved sophisticated means,[11] and a 2-level increase for deriving more than $1 million in gross receipts from one or more financial institutions.[12]  Defendant Miller received a 4-level increase for his role in the offense,[13] a 2-level increase for violating a specific judicial order,[14] and a 2-level increase for obstruction of justice stemming from violations of his conditions of release and by committing perjury during his trial testimony,[15] bringing his adjusted and total offense level to 35, criminal history category I.  Defendant Irvin received a 2-level increase for obstruction of justice stemming from the conveyance of ownership of real estate forfeited by the jury and from attempting to influence and intimidate co-defendant James Sparks,[16] bringing her adjusted and total offense level to 29, criminal history category I.

## III.    Evidence

At the hearing on January 11, 2010, the government offered three exhibits regarding the loss amount.  Special Agent Travis Glaser, who prepared the loss calculation chart, submitted an

---

[9]U.S.S.G. § 2B1.1(b)(1)(I).

[10]U.S.S.G. § 2B1.1(b)(2)(A).

[11]U.S.S.G. § 2B1.1(b)(9)(C).

[12]U.S.S.G. § 2B1.1(b)(14)(A).

[13]U.S.S.G. § 3B1.2(a).

[14]U.S.S.G. § 2B1.1(b)(8)(C).

[15]U.S.S.G. § 3C1.1.

[16]*Id.*

affidavit detailing his analysis,[17] but did not testify at the hearing.  Exhibit S-2 is a Loss

Calculation Summary chart, and Exhibit S-3 is a CD with supporting documentation for the

chart.  Glaser attests that he prepared the document by obtaining information from lenders and

researching county property records.[18]  The chart summarizes twenty-nine homes built by Miller

by buyer, address, lender, date closed, original loan amount, second loan amount, intended loss,

foreclosure sale amount, actual costs associated with foreclosure, loss and the foreclosed

lender/liquidator.[19]  The government estimates the total loss at $2,522,560.33, calculated as

follows:

| | |
|---|---|
| Total Seller Carry-back 2nd Mortgages [Intended Loss] | $ 708,990.00 |
| Total Foreclosure Expenses | $ 303,078.75 |
| Lender Loss | $1,510,491.58 |
| **Total Loss** | **$2,522,560.33** |

Upon questioning by the Court, the government confirmed that the lender loss figure is

simply the difference between the loan amount and the amount gained through the foreclosure

sale.  The government explained that only two original lenders were left when Agent Glaser did

his analysis, and the others were liquidating entities.  The government also confirmed that there

are no appraisals included in the supporting documentation.

Defendant Miller offered into evidence a letter dated November 13, 2009, to Shawn

Brewer of the Probation Office outlining defense counsel's objections to the government's

---

[17]Ex. S-1.

[18]*Id.*

[19]Ex. S-2.

method of calculating loss.[20]

## IV. Analysis

### A. Relevant Conduct

The Court addresses this objection first, as resolution will impact the loss calculation. The PSIR discusses the *Miller I* allegations as a "related case," but does not incorporate any of its fifty-one bank fraud allegations as relevant conduct. Miller requests that the PSIR affirmatively state the position of the Probation Office with regard to the allegations in *Miller I* serving as relevant conduct in this case. Miller also objects to the failure of the PSIR to include as relevant conduct the property transactions in *Miller I*, since these cases allege the same conspiracy. Defense counsel submitted letters to the Probation Office and the government before and after issuance of the draft PSIR questioning the issue of *Miller I* allegations serving as relevant conduct in the sentencing process in *Miller II*. Probation responded that the conduct in this case and *Miller I* are not sufficiently connected or related to be considered as relevant conduct, as there does not appear to be common victims or common accomplices and there appears to be a time interval between the offenses to indicate they were not an ongoing series of offenses. The government did not object to this omission, nor did it conditionally suggest that the *Miller I* allegations might be relevant conduct in light of Miller's assertion of a double jeopardy claim in *Miller I*. The government also refrains from discussing the issue of relevant conduct in its sentencing memorandum.[21]

After the Court took the objections to the PSIR under advisement, trial commenced in

---

[20]Ex. A.

[21](Doc. 439.)

5

*Miller I*.  The Court previously denied Miller's motion to dismiss the conspiracy count in *Miller I* on double jeopardy grounds, but did so without prejudice to renew at trial, should the evidence support interdependence between the two conspiracies.[22]  Subsequently, at the close of evidence in *Miller I*, the Court granted Miller's motion to dismiss the conspiracy count, finding that the two cases involved one, interdependent conspiracy.[23]  Miller was ultimately acquitted on all remaining bank fraud and money laundering charges.[24]

The government has now moved for a new PSIR, with instructions to the Probation Office to conduct a new investigation and prepare a report of all relevant conduct of Miller for purposes of imposing an appropriate sentence, including the *Miller I* transactions.  The government has provided the Court with a "Summary Schedule of Loans and Loss Calculation Amounts" to be presented at sentencing in this case as well as in *Miller I*, which calculates the loss amounts in *Miller I* at approximately $10.9 million.  The government asserts that it had a good faith belief that Miller was a part of two separate conspiracies.  Miller objects to the government's request, arguing that he was ready to be sentenced on January 11, 2010, and that the Court closed the record on the PSIR objections at the end of the first bifurcated hearing.

The district court is authorized to conduct broad inquiry into a defendant's relevant conduct to consider at sentencing, including charges the defendant has been acquitted of, to enhance the defendant's sentence.[25]  The PSIR specifically excluded *Miller I* allegations as

---

[22]Case No. 06-40068, Doc. 406.

[23]*Id*. Doc. 476.

[24]*Id*. Doc. 481.  Six co-defendants still face sentencing in *Miller I*.

[25]18 U.S.C. § 3661; *United States v. Watts*, 519 U.S. 148, 155 (1997).

relevant conduct and the government did not object, despite Miller's inquiries and objections. In fact, the government avoided the issue altogether, instead maintaining its position on double jeopardy relating to the conspiracy count in *Miller I*.[26]

The Court finds the government has not shown good cause to assert this objection now, after the deadlines passed without asserting some relevant conduct claim or objection, and after the Court took the objections to the PSIR under advisement. If defendants had been sentenced as scheduled on January 11, 2010, this issue would be moot. Instead, because of the manner in which the government's loss evidence was presented to the Court, it was necessary to bifurcate the hearing in order to analyze that issue in detail. Rule 32 of the Federal Rules of Criminal Procedure permits a court, for good cause, to allow a party to make a new objection at any time before sentencing is imposed.[27] The government was always capable of making an informed and knowing relevant conduct objection to the PSIR. The double jeopardy ruling in *Miller I* has no relationship to the question of relevant conduct under the Sentencing Guidelines, and clearly could be and was made during the presentence process in *Miller II*. At the time of the hearing on the objections to the PSIR, the government did not make such an objection, the PSIR did not reach such a conclusion, and the Court declines to revisit the issue under these circumstances. The government's motion is denied.

### B. Loss—¶ 52 Miller, ¶ 50 Irvin

The victims in this case are identified as the lending institutions that provided home loans

---

[26]Although the government does not articulate its strategy for declining to respond to Miller's objection or seek application of *Miller I* allegations as relevant conduct, it appears it might have been laying the groundwork for application of consecutive sentences in the two cases, pursuant to 18 U.S.C. § 3147.

[27]Fed. R. Crim. P. 32(i)(1)(D).

to individuals based on defendants' scheme to defraud by means of false loan applications and false appraisals. The PSIR calculated loss based on home foreclosures that have occurred or will occur in the future, with a total loss attributed to defendant of $588,247.61. The PSIR sets out a table outlining the calculation, which is determined on the basis of the original loan amount minus any foreclosures that have occurred. Although the Probation Office reviewed the documents provided by the government in calculating loss, it was unable to understand the information presented by the government on loss amounts, and was unable to determine the origin of the figures in the government's spreadsheet, such as "actual costs associated with foreclosure." Nor did the government provide any evidence of the fair market value of properties not in foreclosure.

The government objects to the PSIR's failure to include intended loss. Specifically, the government argues that the PSIR calculation provides defendants with a windfall, because if the home is not yet foreclosed on, no assessment of expected or intended loss is calculated for that property. Thus, there is no penalty for having placed the unqualified homebuyer into a residence whose value has been artificially and fraudulently inflated. The government also argues that the PSIR does not include the actual costs of foreclosure, even though the government took great pains to obtain and provide those figures. Thus, the government argues, the intended loss exceeds $2.5 million. The government also argues that the PSIR calculation does not take into consideration the "economic reality" of the circumstances of this case, which "contributed to an unprecedented cratering of our economy." The government submits that defendants' gain of more than $6 million is the better method to determine the magnitude of the crime in this case, because it involved loans that should never have been made in the first place. Under any of

these calculations, however, the result is an additional 18 points to the base offense of 7 for an offense level of 25.[28]

Miller agrees with the methodology employed in calculating loss in the PSIR, but objects to the amount calculated as follows: (1) the PSIR assesses loss to Miller for foreclosure sale deficiencies relating to properties of home buyers who refinanced their home loans after obtaining the loan subject to the conspiracy allegations.  Accordingly, a separate and independent loan process was undertaken outside the scope of the alleged conspiracy, and any loss resulting within those subsequent transactions cannot be attributed to Miller.  The loss attributed to these  transactions is $152,610; (2) the PSIR attributes loss amounts to Miller for homes constructed

by Somerset Homes, an entity operated by Steve Middleton.  Miller argues that no basis exists for assessing as loss to him, any loss related to a Somerset Home transaction.  The loss associated with these transactions is $58,000; and (3) the failure of the PSIR to include as relevant conduct the property transactions in *Miller I*.  With these deductions, Miller argues, the loss amount is $377,637.61, which results in a 12-level enhancement, rather than 14.  Irvin joins in Miller's objections.  At the January 11, 2010 hearing, Miller objected to the government's position that gain was an appropriate measure of loss.  Neither defendant addresses the government's argument that intended loss should be applied.

### Guideline

Guideline § 2B1.1(b)(1) states that if there is a loss that exceeds $5000, the court should increase the offense level by an amount corresponding to the applicable range of loss specified in

---

[28]U.S.S.G. § 2B1.1(b)(1)(J) (increase of 18 points for loss more than $2.5 million but less than $7 million).

the guideline. In general, "loss is the greater of actual loss or intended loss."[29] The government has the burden of proving actual and intended loss by a preponderance of the evidence.[30] "[T]he district court may increase the offense level for a defendant convicted of fraud based upon the actual financial loss caused by the defendant's fraudulent conduct or the loss intended by the defendant, whichever is greater."[31] "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."[32] "Pecuniary harm means harm that is monetary or that otherwise is readily measurable in money," and to be reasonably foreseeable, it must be "harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense."[33] "Intended loss" is defined as "the pecuniary harm that was intended to result from the offense; and includes intended pecuniary harm that would have been impossible or unlikely to occur. . . ."[34] The district court "need only make a reasonable estimate of loss."[35] The Guidelines include a nonexhaustive list of factors a court might consider in estimating the loss, including "the approximate number of victims multiplied by the average loss to each victim," and the "reduction that resulted from the offense in the value of equity securities or other corporate assets."[36]

---

[29]U.S.S.G. § 2B1.1, cmt. n. 3(A).

[30]*United States v. Griffith*, —F.3d—, 2009 WL 3429767, at *4 (10th Cir. Oct. 27, 2009) (citations omitted).

[31]*United States v. Galloway*, 509 F.3d 1246, 1251 (10th Cir. 2007) (citing U.S.S.G. § 2B1.1, cmt. n. 3(A)).

[32]U.S.S.G. § 2B1.1, cmt. n. 3(A)(i)-(iv).

[33]*Id.*, cmt. n. 3(A)(iii).

[34]*Id.*, cmt. n. 3(A)(ii).

[35]*Id.*, cmt. n. 3(C).

[36]*Id.*, cmt. n. 3(C)(iii)-(iv).

*Gain*

Application Note 3(B) to § 2B1.1(b)(2) states: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."[37] The Tenth Circuit has not specifically addressed this issue under § 2B1.1, but has recently reaffirmed in cases addressing predecessor § 2F1.1,[38] that an offender's gain may be used as an "alternative estimate" only in certain circumstances.[39] As § 2B1.1 adopts the same requirements with respect to use of gain as an alternative measure of loss, those cases are instructive here. "[T]he district court must first estimate the actual and intended loss due to a defendant's fraudulent conduct, and then consider whether the defendant's gain is a reasonable estimate of the actual or intended loss."[40] However, a district court may not "simply choose to substitute gain as a measure of loss without a basis for why that substitution is reasonable."[41] In making a reasonable estimate of the loss, the district court is required to address the various amounts of loss proposed, "especially in the case of a moving target."[42] "If gain to the defendant does not correspond to any actual, intended, or probable loss, the defendant's gain is not a

---

[37]U.S.S.G. § 2B1.1(b)(2), cmt. n. 3(B). *See United States v. Abiodun*, 536 F.3d 162, 167 n.4 (2d Cir. 2008) (explaining such a situation could arise, for example, where the government is unable to identify any victims of a fraud offense and cannot ascertain the losses they suffered).

[38]In 2001, Amendment 617 consolidated U.S.S.G. § 2F1.1 into § 2B1.1.

[39]*United States v. Gallant*, 537 F.3d 1202, 1237-38 (10th Cir. 2008) (citing *United States v. Galloway*, 509 F.3d 1246, 1250-53 (10th Cir. 2007); *United States v. Haddock*, 12 F.3d 950, 960 (10th Cir. 1993) (interpreting former § 2F1.1)).

[40]*Id*. (quoting *Galloway*, 509 F.3d at 1252 (citing *Haddock*, 12 F.3d at 961)).

[41]*Id*.

[42]*Id*.

reasonable estimate of loss."[43]

The Court declines to use gain as an alternative measure of loss in this case. Although the government advocates the use of gain because the scheme involved loans that should never have been made in the first place, there is no serious suggestion that loss cannot reasonably be determined. This case involves mortgage-backed securities as collateral and, as discussed below, a reasonable estimate of loss can be associated with defendants' fraud.

### Loss Calculation

In this case, defendants defrauded lenders by inflating home values and falsifying loan applications to qualify otherwise unqualified home buyers. As explained above, the Court need only make a reasonable estimate of loss. And, although the government combines both actual and intended loss in its total loss calculation, the Court only considers the greater of the two.[44]

Both the PSIR and the government calculate actual loss to the lenders based on the difference between the loan amount and the foreclosure sale amount. U.S.S.G. § 2B1.1 states, as a general rule, that "[l]oss shall be reduced by . . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."[45] In cases like this one, where collateral has been liquidated by the time of sentencing and whose value may fluctuate over time, the Guideline sets out the rule that collateral is to be valued at the amount for

---

[43]*Id.* (quoting *Haddock*, 12 F.3d at 961).

[44]U.S.S.G. § 2B1.1, cmt. n. 3(A).

[45]*Id.*, cmt. n. 3(E)(i).

which it was liquidated, or if not liquidated, at its fair market value at the time of sentencing.[46]

The government's calculation of actual loss is not a reasonable estimate. First, the government's actual loss figure includes sale deficiencies for individuals who refinanced their loans through a separate and independent loan process outside the scope of the conspiracy. The losses associated with these refinanced transactions should not be attributable to defendants. In addition, the government's calculation appears to be mathematically inaccurate. As outlined in Miller's Exhibit A, the "loss" column of Exhibit S-2 is replete with apparent errors. For example, in transaction number 23, the loan amount was $168,000 and the foreclosure sale amount was $161,500; yet, the government attributes a loss amount to this property at $103,238.72.[47] The government offers no explanation for these calculation errors, despite questions from and objections by Miller. Finally, actual loss does not include interest of any kind, finance charges, late fees, penalties, or similar costs.[48] As conceded by the government, the actual loss calculation in Exhibit S-2 is based on the liquidators' total sum of costs, which includes these excluded items.

To the extent the Court considers actual loss based upon deficiency amounts after foreclosure, it finds the amount calculated in the PSIR to be the more reasonable estimate. The Court agrees with Miller that the refinanced transactions should not be attributable to him, resulting in a reduction of $152,610. The Court disagrees with defendant, however, that the loss amounts attributable to the Somerset Homes transactions should not be assessed to him. Miller

---

[46]*Id.*, cmt. n. 3(E)(ii).

[47]Ex. S-2.

[48]U.S.S.G. § 2B1.1, cmt. 3(D)(i).

13

did not always build the homes that were part of the scheme, but sometimes used builders such as Middleton, and directed the pricing, sale and closing of the transaction. Miller directed the sale of the Somerset Homes. Although Middleton constructed the homes, Miller directed Middleton by setting the price and seller carrybacks. Miller at times directed Middleton to front the down payment himself. Accordingly, these homes are within the scope of the conspiracy and the Court considers the transactions as relevant conduct. Thus, the actual loss amount as calculated by the PSIR is reduced to $435,637.61.

Mathematical calculations notwithstanding, application of the general rule regarding credits against loss to this case is problematic for several reasons. First, market factors skew the amount received by the lender at foreclosure. As acknowledged by the government, there is no information in the supporting documentation about the foreclosure sales, specifically, whether the lender bid in or whether it was an actual sale, or if the lender bids were based on appraisals or the loan balance. In addition, with two exceptions, the foreclosed lender was not the original lender, but rather, a liquidating entity. These liquidators are not victims of defendants' fraudulent scheme. The Guidelines take into account that if there is to be a deduction taken from the loan through sale of collateral, it should involve the amount recovered by the victim.[49] Thus, the actual loss amount attributable to the deficiencies after foreclosure is not the best measure of loss in this case.

Instead, the Court finds that intended loss is the better measure under the circumstances of this case. Here, defendants used false financial information in loan applications to put unqualified buyers into homes whose values were falsely inflated through fraudulent appraisal

---

[49]*Id.*, cmt. n. 3(E)(ii).

practices.  Because the home buyers in this case were seeking subprime loans, the likelihood of

loan default was considerable, with the probable consequence that the lenders would only be

able to recover the value of the mortgaged properties upon foreclosure.[50]

In support of its intended loss argument, the government cites the First Circuit decision

in *United States v. McCoy*.[51]  In that case, the conspirators purchased property, usually at

auction, arranged for grossly inflated appraisals, obtained mortgage-based loans on fraudulent

documentation, selling the properties to unsophisticated, unqualified buyers with low income,

bad credit, or both.[52]  Those who bought the homes were left with artificially inflated mortgages

and usually defaulted.  The lenders were generally unable to recoup the full value of their loans

because the foreclosed homes were worth less than the false appraisals had indicated.  The First

Circuit noted that since the defendant was obtaining loans for individuals with low income and

poor credit, he should have expected that the banks would probably recover only the value of the

mortgaged property, concluding, "[I]ntended loss was therefore the value of the loans less the

expected value of the properties."[53]  Because the land-flipping in *McCoy* occurred rapidly, the

court found that the purchase price paid by those engaged in the scheme was the reasonable

proxy of the value of the collateral at the time the frauds occurred.[54]

In this case, the expected value of the overinflated properties cannot be determined by the

purchase price, since the homes were newly constructed by Miller.  Instead, the best measure of

---

[50]*See United States v. Baum*, 555 F.3d 1129, 1133-34  (10th Cir. 2009).

[51]508 F.3d 74, 76 (1st Cir. 2007).

[52]*Id*. at 76.

[53]*Id*. at 79.

[54]*Id*.

the loss associated with the inflated appraisals would be a forensic appraisal of the property at the time of the loan, compared with the appraisal submitted to the lender. The government has failed to provide any forensic appraisal evidence of the inflated value of the mortgaged properties.

The Court finds, however, that intended loss in this case can be measured by loss associated with defrauding the lender into providing 100% financing. For each loan, the price of the home shown on the purchase agreement was inflated above the actual agreed-upon sales price in the form of "carryback" second mortgages to Miller. The lenders were not told that the builders rather than the borrowers had paid the down payments and/or closing costs and treated them as carrybacks covered by second mortgages. The result was that the lenders extended loans at a higher loan-to-value ratio than their loan documentation indicated, to borrowers whose incomes could not support the loan payments, and whose credit history indicated that they were poor risks for payment. After closing, defendants would encourage the home buyer to seek refinancing, which would result in payoff of the second mortgage. Although the loss on each foreclosure would not necessarily equal the carryback second mortgage amount, the Court finds that figure would be a reasonable measure of the probable loss. The inflated value—the true sales price plus the carry-back second mortgage—was likely to exceed the market value by at least the carryback second mortgage amount. Indeed, considering that a foreclosure sale generally does not recover the market value, the lender would be fortunate if its loss were *only* the carryback second mortgage amount, making a total loss of $708,990.00 a conservative estimate.

Accordingly, the parties' objections are sustained in part. The Court applies the intended

loss figure of $708,990.00, rather than the lesser, problematic actual loss figure of $435,637.61, which does not result in a change in the 14-point enhancement calculation under U.S.S.G. § 2B1.1(H).

### C.     Number of Victims---¶ 62

The PSIR added 2 levels because defendants victimized more than ten but less than fifty victims, both federally insured lending institutions and home buyers.[55]  Defendant Irvin objects to the enhancements for number of victims, since only one lender, First National Bank, Lake Ozark, Missouri, was federally insured.

Defendant's objection is overruled and denied.  Application Note 1 of § 2B1.1 defines a "victim" as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); . . . 'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies."  In addition, a victim remains a victim for guideline purposes even if they were able to offset losses through forfeiture of collateral or repossession of property.  Moreover, as the Court previously held in the post-trial Rule 29 order, under 18 U.S.C. § 1344(a)(2), the victim need not be a federally insured bank as long as property under the custody and control of a federally insured bank is obtained via the scheme to defraud.[56]


### D.     Sophisticated Means---¶ 64 Miller, ¶ 63 Irvin

The PSIR imposes a 2-level enhancement for sophisticated means,[57] on the basis that

---

[55]U.S.S.G. § 2B1.1(b)(2)(A).

[56](Doc. 421 at 29.)

[57]U.S.S.G. § 2B1.1(b)(9)(C).

defendants targeted potential home buyers with low or poor credit; advised buyers they needed

little to no money down; offered to pay closing costs; offered second mortgages; inflated

appraisal prices by performing multiple appraisals; altered documents to meet desired appraisal

values; utilized appraisers who would meet desired values; falsified loan documents.  Defendants

argue that the enhancement is not justified because many of the bases in the PSIR do not support

some concept of sophisticated or intricate means, and second mortgages were offered and

executed.

Defendants' objection is overruled and denied.  The enhancement is appropriate because

defendants' scheme required specialized knowledge of the mortgage industry, including

construction and finance, as well as a grasp of how to promote and operate a large business.

Defendant Miller established a "one-stop shop" to provide all the necessary services to complete

all real estate transactions and evaded detection until the monitoring firm of Meara & King

reported concerns regarding a possible fraudulent real estate transaction of a home from Star

Land Development to Kerrie Jordan in July 2006.

### E.    Gross Receipts---¶ 65 Miller, ¶ 64 Irvin

Defendants object to the 2-level enhancement for deriving more than $1,000,000 in gross

receipts from one or more financial institutions as a result of the offense.[58]  As part of

defendants' scheme, home buyers obtained loans from lenders who took mortgage interests in

the property subject to purchase.  Funds flowed to the individual buyers from the lenders, by way

of the respective title company handling the real estate transaction.  At closing, the title company

would disburse funds of the buyer per the settlement agreement, which in some instances was

---

[58]U.S.S.G. § 2B1.1(b)(14)(A).

Miller Enterprises or Star Land Development, or Somerset Homes. The government presented evidence at the forfeiture proceedings of the amount of buyer's funds that flowed to Miller and/or his company, which delineates between proceeds to Miller and proceeds to his co-conspirator, Vanatta.[59] As summarized by the government's Exhibit A-2 from the forfeiture proceedings, Miller is alleged to have received $581,441.30 in proceeds from the home loans provided the buyers. There is no comparable summary for co-defendants Vanatta or Irvin. The evidence with respect to Irvin's gross receipts was based on bank reconciliations for all funds received from Irvin and her husband, Vanatta for the calendar years 2004 and 2005, in the amount of $1,299,968.85 and $806,518.31, respectively.[60]

In order to establish a basis for the gross receipts enhancement, a defendant must have derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense. The receipts must be individually derived.[61] The evidence provided with respect to Miller demonstrates that he received less than $600,000 in proceeds, and those proceeds are from the buyers of the homes. The evidence with respect to Irvin does not indicate the source of the proceeds, but if they were obtained "as a result of the offense," they would have come from the buyers of the homes as did Miller's. Defendants note that the government seems to acknowledge this problem by arguing that defendants substantially jeopardized the safety and soundness of a financial institution. The government does not respond to this objection or issue. The Court agrees with defendants, and their objection is sustained.

---

[59]Forfeiture Ex. A.

[60]Tr. Exs. 4002, 4008.

[61]*United States v. Weidner*, 437 F.3d 1023 (10th Cir. 2006).

### F.        Role in Offense

#### 1.        Miller---¶ 67

Miller objects to the 4-level enhancement for being a organizer/leader of the conspiracy. Relevant factors in the PSIR include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.[62]  Defendant argues that co-conspirators Sparks and Middleton did not provide testimony that establishes Miller as an organizer or leader, and that much of co-conspirator Angela Parenza's testimony related to Miller during *Miller I* and does not provide a sufficient basis for the enhancement.

Defendant's objection is overruled and denied.  U.S.S.G. § 3B1.1(a) states that an aggravating role enhancement is warranted when the defendant was the organizer and leader of criminal activity that involved five or more participants or was otherwise extensive.  Application Note 4 of § 3B1.1 states the aggravating role adjustment does not depend on a defendant's title, but factors such as set forth above.  Without Miller's participation, there would have been no fraudulent loan transactions.  Moreover, Parenza's testimony established that Miller was the organizer and leader, and described his business operations and motives; she went on to describe how this did not end with respect to his new business conspiracy or operations with Vanatta. Middleton corroborated that Miller directed the operation, and that they were to do whatever it would take to get houses sold.  To that end, Miller directed and led others to set prices based on

---

[62]U.S.S.G. § 3B1.1, cmt. n. 4.

false and inflated appraisals based solely on Miller-built homes, obtain loan approvals with false documentation that buyers were coached to create or that co-conspirators created for them, use mortgage brokers who participated in the fraudulent creation of loan applications and documentation, including settlement sheets that failed to disclose that buyers made little or no down payments, and that builders or Miller fronted down payment in cash or on paper, taking back a secret second mortgage that Miller made little effort to collect, preferring that buyers get it rolled into a new refinance later on.  Thus, the 4-level enhancement is appropriate.

## 2.    Irvin---¶ 66

The PSIR does not make any adjustments for Irvin's role in the offense.  Irvin objects, and argues that she is entitled to a 2-level decrease because she was a minor participant in the criminal activity.  Irvin contends that this adjustment is particularly appropriate where, as here, a defendant is held accountable for enhancements in the overall conspiracy.

Defendant's objection is overruled and denied.  A minor participant is a person "who plays a part in committing the offense that makes him substantially less culpable than the average participant."[63]  An example of a minor participant would be a drug mule.  By contrast, Irvin worked in Vanatta's offices and it was her company, Innovative Design, that produced the invoices for the "construction management fees" that were actually Vanatta's real estate commissions.  Irvin also drafted the invoices that falsely represented that her company had performed construction management services on the houses sold, which then appeared as false line items on the HUD settlement sheets at closing.  Because Vanatta could not have a bank account, these fees were deposited into Irvin's bank accounts, as were Vanatta's share of fees

---

[63]U.S.S.G. § 3B1.1 cmt. n. 3(A) and 5.

with co-defendant Sparks. Irvin and Vanatta also purchased a home for themselves as part of the conspiracy, using the same manner and means used to obtain financing. As part of the purchase of the Regency Cove property, Irvin submitted a false financial statement and tax returns to the lender. Finally, Irvin purchased a large boat, "Bling Bling," with proceeds from the fraud that flowed into one of her business accounts for HCI. Therefore, the 2-level downward adjustment is not appropriate.

## G.    Obstruction of Justice

### 1.    Miller---¶ 68

The PSIR imposes a 2-level enhancement for Miller violating his conditions of release in *Miller I*[64] as well as a 2-level enhancement for obstruction for violating the conditions of his release and testifying at trial.[65]  Miller asserts that his conduct in allegedly violating his bond is accounted for in ¶63 of the PSIR, violation of a judicial order, and the obstruction enhancement thus constitutes double-counting. Moreover, Miller argues, his testimony during trial does not independently warrant the obstruction enhancement.

Defendant's objection is sustained. U.S.S.G. § 2B1.1(b)(8) states that an enhancement for violation of a judicial order should be imposed when it is "not addressed elsewhere in the guidelines." The commentary states that "[i]f the conduct that forms the basis for an enhancement under subsection (b)(8)(B) or (C) is the only conduct that forms the basis for an adjustment under 3C1.1 (Obstructing or Impeding the Administration of Justice) do not apply the

---

[64]U.S.S.G. § 2B1.1(b)(8)(C).

[65]U.S.S.G. § 3C1.1.

adjustment under 3C1.1."[66]  Defendant's testimony at trial is not an independently sufficient

basis for imposition of the obstruction enhancement.  Miller acknowledged in his trial testimony

material items deemed relevant by the government and this Court.[67]  Miller's testimony

disclaiming any knowledge of or complicity in any criminal conduct in this matter is not the type

of behavior the enhancement is intended to punish.  The Application Notes make clear that, short

of perjury, a defendant's general denial of guilt or refusal to admit guilt is not a basis for

application of the obstruction provision.[68]  Moreover, although the PSIR was amended upon

objection of the government to reflect there was evidence of all the defendants in this case,

through the destruction of records, providing false evidence in a judicial proceeding, attempting

to influence a witness and other issues, there was no specific evidence linking Miller to this

conduct.

### 2.      Irvin---¶ 67

The PSIR imposes a 2-level enhancement based on defendant conveying ownership from

herself as a single person to joint tenancy with Ryan K. Messenger on the real estate located at

415 Regency Cove, Lake Ozark, Missouri, against which the jury rendered a special forfeiture

verdict.  In addition, defendant attempted to influence and intimidate co-defendant James Sparks

to turn over incriminating evidence and destroyed evidence once the issuance of a Grand Jury

subpoena was discovered.  Irvin objects to the enhancement, arguing that while she did convey

title to the Regency Cove property from herself as a single person to joint tenancy with Ryan

---

[66]U.S.S.G. § 2B1.1(b)(8)(C), cmt. n. 7(E)(ii).

[67](Doc. 421.)

[68]U.S.S.G. § 3C1.1, cmt. n. 2.

Messenger, the government has filed a *lis pendens* on the property. Irvin also argues that she was acquitted of the charges in Count 6, alleging destruction of records in a federal investigation, and Count 8, corruptly influencing a witness (Sparks), and thus, this conduct cannot be the basis for an obstruction enhancement.

Defendant's objection is overruled and denied. Even with the omission of the transfer of the Regency Cove property as a basis, defendant's other conduct warrants the obstruction enhancement, despite the acquittal by the jury. The Supreme Court has held that conduct underlying charges for which the defendant has been acquitted may be relied on in sentencing.[69] The Court noted that sentencing courts have broad discretion to consider various kinds of information, and the jury cannot be said to have "necessarily rejected" any facts when it returns a general not guilty verdict.[70] The Tenth Circuit has subsequently upheld reliance on acquitted conduct.[71] This does not violate *Apprendi*[72] where the use of acquitted conduct does not increase the sentence beyond the statutory maximum for the offense of conviction.[73] Nor does the *Booker*[74] decision, which made the guidelines advisory, bar sentencing on the basis of acquitted conduct.[75] Thus, the 2-level enhancement for obstruction is justified.

---

[69]*United States v. Watts*, 519 U.S. 148 (1997).

[70]*Id.* at 155.

[71]*United States v. Mendez-Zamora*, 296 F.3d 1013, 1020 (10th Cir. 2002) (acquitted conduct did not violate double jeopardy); *United States v. Yarnell*, 129 F.3d 1127, 1137 (10th Cir. 1997) (basing sentence on total losses to forty victims even though defendant was convicted of only two counts of mail fraud and acquitted of five other counts).

[72]*Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[73]*United States v. Booker*, 543 U.S. 220 (2005).

[74]*Mendez-Zamora*, 296 F.3d at 1020.

[75]*United States v. Manning*, 147 F. App'x 24, 29 (10th Cir. 2005).

### H. Jeopardizing Financial Institutions

The government contends that an additional four levels should be added for both defendants because the offense substantially jeopardized the safety and soundness of the financial institutions involved in making these loans, as evidenced by the fact that only two financial institutions remain in business after these loans.

The government's objection is overruled and denied. The Application Note to U.S.S.G. § 2B1.1 sets forth a non-exhaustive list of factors to be used in determining whether the safety or soundness of a financial institution has been substantially jeopardized.[76] In applying this enhancement, there must be a provable causal link between the offense and the jeopardy to the financial institution. An offense shall be deemed to have "substantially jeopardized the safety and soundness of a financial institution" if, as a result of the offense, the solvency or financial security of an organization was substantially endangered.[77] In this case, it is unknown if the financial institutions' solvency was directly related to defendants' actions or was the result of practices of the financial institutions, over-concentration of credit, or the current economy.[78] Thus, the Court declines to apply this 4-level enhancement.

### I. Victim Impact---¶ 53 Miller, ¶ 45 Irvin

The PSIR states that determining restitution would complicate or prolong the sentencing

---

[76]U.S.S.G. § 2B1.1, cmt. n. 12.

[77]U.S.S.G. § 2B1.1(b)(14)(B).

[78]As noted by the Probation Office, this question is further illustrated by the fact that, according to the FDIC, approximately 140 banks have become insolvent during the year 2009 alone, the largest number of annual bank failures since 1992. *See* http://www.fdic.gov/bank/individual/failed/index.html

process to a degree that the need to provide restitution is outweighed by the burden on the sentencing process.  The government objects on the ground that these paragraphs should be amended to indicate that there are only two institutions capable of receiving restitution.

The government's objection is overruled and denied.  Probation has responded that attempts were made in contacting victims in this matter, which proved to be unsuccessful. Individuals who purchased homes from Miller often moved, left no forwarding address or did not reply.  The lending institutions either closed, changed names or owners, continued to transfer various requests to other departments within the institution, or did not reply.  Probation concedes that only two institutions remain that are capable of receiving restitution, and at this time, the Court does not know who purchased or has acquired the original lenders or if the FDIC or another entity has been appointed receiver.  There is no method for determining restitution for those institutions no longer in business.  Since the victim's losses are not ascertainable at this time, the Court orders this restitution matter be set over until July 16, 2010, pursuant to 18 U.S.C. §3664(d)(5).

**J.     Concurrent Sentence**

The government contends that Miller is subject to consecutive sentencing for committing crimes while on conditions of release.  In support of its position, the government cites 18 U.S.C. § 3147, which provides:

> A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense to—(1) a term of imprisonment of not more than ten years if the offense is a felony; . . .
> A term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment.

The government argues that Miller was convicted of two counts of criminal contempt in this case while on release, and requests a consecutive sentence in the range of two to three years to run consecutive to the other sentences imposed in this case. The Court defers ruling on the government's objection until the final sentencing hearing, where it will hear additional argument on this issue.

**K.      Miscellaneous**

Pursuant to Fed. R. Crim. P. 32(i)(3)(B), the Court determines that a ruling on the following objections is unnecessary because the matters will not affect sentencing: with respect to defendant Irvin's PSIR, government's Objection Numbers, 4, 7; defendant's Objection Numbers 1, 2, 3. With respect to defendant Miller's PSIR, government's Objection Numbers 5, 7; defendant's Objection Numbers 1, 2, 3, 5, 10, 11.

**V.  Conclusion**

The Court calculates defendants' respective total offense levels as follows:

**A.  Miller**

| | |
|---|---|
| Base Offense Level: | 7 |
| § 2B1.1(b)(1) [loss] | 14 |
| § 2B1.1(b)(2)(A) [victims] | 2 |
| § 2B1.1(b)(8)(C) [violation of court order] | 2 |
| § 2B1.1(b)(9)(C) [sophisticated means] | 2 |
| Role in Offense | 4 |
| **Total Offense Level** | **31** |
| **Criminal History Category** | **I** |
| **Guideline Range:** | **108-135 months** |

**B.  Irvin**

| | |
|---|---|
| Base Offense Level: | 7 |
| § 2B1.1(b)(1) [loss] | 14 |
| § 2B1.1(b)(2)(A) [victims] | 2 |
| § 2B1.1(b)(9)(C) [sophisticated means] | 2 |
| Obstruction of Justice | 2 |
| **Total Offense Level** | **27** |
| **Criminal History Category** | **I** |
| **Guideline Range:** | **70-87 months** |

Pursuant to the Court's order bifurcating sentencing, a final sentencing hearing has been set for **April 19, 2010, at 9:00 a.m.**, at which time the Court will hear argument on 18 U.S.C. § 3553 factors and impose final sentence.

**IT IS SO ORDERED.**

Dated: April 15, 2010

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE