IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 06-40151-JAR |
| ) | |
| F. JEFFREY MILLER, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM AND ORDER

**Background**

F. Jeffrey Miller (Miller) was convicted by a jury of conspiracy to commit bank fraud, money laundering and criminal contempt charges. He was sentenced to 72 months of custody. After being released on January 10, 2014, his three year term of supervised release commenced. On October 29, 2014, the Court heard evidence on a petition to revoke Miller's supervised release for violation of four conditions of release. Because the Court concludes that Miller has violated all conditions of release that underlie the petition for revocation, the Court orders that Miller's term of supervised release be revoked. The Court will later issue a notice scheduling the sentencing hearing.

**Petition for Revocation**

The petition for revocation alleges that Miller committed four violations of the conditions of supervised release. First, he violated a special condition that he not be employed in any capacity in which he has discretionary authority over financial matters, without approval of the probation officer. Secondly, Miller violated a standard condition that he answer truthfully all

inquiries by the probation officer and follow instructions of the probation officer. Thirdly, Miller violated the standard condition that he not commit another federal, state or local crime by submitting false monthly reports to his probation officer, under penalty of perjury. And fourthly, Miller violated the standard condition that he not commit another federal, state or local crime by traveling in interstate commerce and using a telephone to communicate in interstate commerce a threat of bodily harm with the intent to extort money.

**The Business of TSH and Miller's involvement with TSH**

The Court heard testimony in a day-long revocation hearing, and received documentary evidence from both parties. Much of the evidence concerned the business practices and transactions of Tri-States Holding, LLC (TSH), a company owned by Miller's son Brandon Miller (Brandon), but actually controlled and operated by Miller. The alleged violations of supervised release all spring from Miller's involvement with TSH; he lied to his probation officer about his true role in TSH which included his control of operational and financial matters, and he threatened Lisa Montgomery with bodily harm, if she did not pay money associated with her purchase of a house from TSH. Moreover, while the petition for revocation does not allege that Miller committed a violation of law by operating TSH, the Court heard substantial evidence about the fraudulent practices and transactions of TSH under the control and direction of Miller. This evidence was not offered as a separate violation of the conditions of supervised release, but it is highly relevant to the appropriate sentence to be imposed upon revocation.

Moreover, because this evidence concerning the business practices and transactions of TSH helps explain the evidence concerning Miller's role in TSH and his threats to Lisa Montgomery, the Court starts by summarizing the substantial evidence about the fraudulent

practices and transactions of TSH. Based on the contracts and other transactional documents admitted into evidence, as well as emails that constitute party admissions by Miller and other TSH personnel, and based on the testimony of witnesses and the admitted statements and memoranda of interviews of many more witnesses,[1] the Court finds the following by a preponderance of evidence.

While Miller was still in prison, he formulated the business plan for TSH. In routinely-recorded prison phone calls, Bureau of Prison officials heard Miller discussing Miller's business plan with 23 year-old son, Brandon. Miller promised Brandon a car if Brandon would invest his college fund in the business. Bureau of Prisons officials also heard Miller asking Brandon for his social security number in order to open lines of credit. Miller later told others, including TSH employee Tony Caldwell and TSH investor Allen Roe, that he had used Brandon's college fund to start TSH. Roe stated that he believed Brandon had invested about $60,000 in TSH.

Further, while still in prison, Miller discussed his business plans with other inmates, including Gerald Snow. At some point, Judy Snow, Gerald's mother, became Registered Agent of another LLC in Oklahoma, also called TSH; and upon Gerald's release from prison, Gerald reported to his probation officer in Oklahoma that he operated a business called TSH and employed other inmates at that business in Oklahoma. Miller also discussed his plan with fellow inmate Ray Ray Hickman, who upon release became one of the first to buy a house from TSH in Kansas City.

Bureau of Prisons officials were so concerned about what they heard about Miller's

---

[1] Because the rules of evidence do not apply to hearings on revocation of supervised release, it is permissible and customary for the court to consider admitted reports of interview or other hearsay statements in connection with a petition for revocation of supervised release. FRE 1101(d)(3).

business plans, that before Miller was released from prison, they began contacting Wendy Landry, a United States Probation Officer for the District of Kansas[2] and IRS Special Agent Travis Glaser, who had investigated Miller on the wide-ranging mortgage fraud for which Miller had previously been convicted.  Bureau of Prisons officials continued to contact Landry, after Miller was moved to a halfway house in the Kansas City area and still under Bureau of Prisons custody.

By the time Miller commenced supervised release on January 10, 2014, Landry was well aware that the Bureau of Prisons personnel were concerned about Miller's planned activities, but neither she nor the prison officials knew exactly what Miller's plans were.  Miller told Landry that his son Brandon had formed a business, TSH, to buy, refurbish and flip houses; and that Miller would be working for TSH merely as a laborer.  Later, Landry told Miller that TSH needed to verify how much they were paying Miller for his labor; only then did TSH start paying Miller in checks.

TSH was not in the business of buying, refurbishing and flipping houses.  Rather, TSH's business, in a nutshell, was a "contract for deed scam," as Peter Hoffman, a legal aid attorney testified at the revocation hearing.  Hoffman represents a number of the eighteen victims of TSH who have now filed consumer complaints with the Missouri Attorney General.  Hoffman has also filed a civil lawsuit against TSH, Brandon, Miller and Tony Caldwell.   TSH purchased more than 40 houses at Jackson County Missouri tax sales.  TSH then advertised these houses for sale to low-income people in the urban core in Kansas City, Missouri.  TSH offered them

---

[2]Although Miller was not yet under Landry's supervision, she was assigned his file, a common practice so that the assigned supervisory probation officer is ready to commence supervision on the first day the inmate is released.

home ownership for just $500 down, sweat equity of no more than $2000 in the form of cosmetic repairs like painting and clean up; and then monthly payments of $399.  The buyers signed contracts with TSH for purchase prices in the range of $35,000.

Notably, the contracts stated that the buyers would make monthly payments of $399 on the financed amount, with interest of 6.55 percent per annum, but the contracts did not reveal the number of monthly payments, the amortization schedule or any other information concerning the total payments.  The contract also stated that upon payment of all amounts due, TSH would deliver a "Statutory Warranty Deed" to the buyer in fulfillment of the contract.  In practice however, TSH personnel, including Miller, represented to buyers and others that the buyers would receive a deed to the property at the outset of the contract.  One example of such a representation is found in a form letter from TSH  dated April 10, 2014 to "All, Homeowners" that states in pertinent part,

> *Upon receiving your April payment, you will be doing papers for your deed to be filed with the Jackson County Recorder of Deeds Office.*  Once that happens, this will allow you, as the listed property owner, all the benefits of a home owner in Jackson County.

In fact, TSH had two "deed signing" parties, where the buyers were supposed to receive their deeds.  With few exceptions, however, buyers either did not receive a deed, or if they did, TSH never recorded the deed.

Hoffman testified that his focus as a legal aid attorney is on working to foster affordable housing in the urban core.  Hoffman went to a meeting in June 2014, was introduced to Tony Caldwell, an employee of TSH, and later that day to Miller, who represented himself to be the owner of TSH.  After reviewing the TSH form contracts and speaking to Miller and Caldwell, Hoffman declined to recommend that any of his clients contract with TSH.  In addition to the

contractual anomalies outlined above, Hoffman noted that the contracts allowed TSH to sue for judicial foreclosure and deficiency judgments against the buyers.

TSH had purchased most of the houses for $3000 or less in the tax sale, yet sold the houses for about $35,000 to most buyers.  The houses were not appraised; all of them were worth far less than the contract prices.  Hoffman testified that many of the houses had numerous code violations and nuisance complaints.  Under the terms of the contract, after the buyers made the $500 downpayment, TSH was required to complete "all major work like electrial (sic), plumbing, furnance (sic), hot water tank, widows (sic), doors, floors, cabinets..."  The contract further stated that after TSH completed the major work, the buyers must "bring the property up to code or liveable within 60 days."  TSH personnel, including Miller, represented to buyers and others, including investors, that this meant that the buyers were responsible only for cosmetic repairs, such as painting and cleaning up the lot and house.

TSH personnel, including Miller, also represented that until TSH completed major work and the buyers took possession, the buyers obligation to make the monthly payments did not commence.  These representations are consistent with representations made in an "Executive Summary" that TSH apparently provided to potential investors, describing the improvements TSH made to the properties before the buyers took possession of the houses, to wit:

- No structural problems, including foundations and footings
- Roof life at least 5 years
- No extensive exterior damage including major wood rot or termite damage
- Working electrical and plumbing
- Will not require repairs that require work permit
- Will not require repairs over $10,000.00 including cost of home
- Work to be limited to primarily cosmetic repairs

In practice, however, TSH personnel, including Miller, encouraged buyers to take

possession of the houses before TSH commenced, performed and/or completed repairs. In practice, TSH personnel, including Miller, encouraged buyers to spend money and labor on painting, clean up and cosmetic repairs, as sweat equity before TSH completed the major work. Then TSH failed to complete the major work, either performing shoddy repairs or virtually no repairs at all. Nonetheless, TSH personnel, including Miller, demanded monthly payments from the buyers, which escalated into harassment and threats when buyers ceased making payments.

Despite Miller's oral and written representations to his probation officer that he was a mere laborer employee of TSH, the evidence proves that Miller controlled and directed TSH's financial and operational matters, in violation of the conditions of supervised release. Attorney Peter Hoffman testified that Miller represented to him that Miller was the owner and operator of TSH. And Landry testified that she met with Miller and his son Brandon on several occasions about TSH; in each meeting Miller dominated the conversation about TSH's business transactions and Brandon contributed little or nothing to the conversation. Landry testified that it was apparent to her that Brandon knew very little about the acquisition of houses, the conditions of the houses or other business operations.

Miller not only formulated TSH's business plan, he solicited and directed the capitalization of TSH. Miller convinced his son Brandon to invest his college fund. TSH was also capitalized by a $50,000 loan that Miller solicited from Allen Roe. Roe stated that all of his negotiations were with Miller; Brandon was not involved, other than to sign the loan documents

7

on behalf of TSH.[3] Miller also attempted to solicit financing from Jim Bowlin, who declined.[4] Bowlin stated that it was Miller who approached him to solicit financing for TSH's purchase of 50 houses, and that it was apparent to Bowlin that Brandon was the owner of TSH in name only.

Moreover, Miller decided which houses TSH would purchase, as evidenced by this June 8, 2014 email to DS&K Investment from Miller's personal email account, in which Miller stated in pertinent part,

> Spencer, I looked at the houses on the KS side this weekend and I will pass on them. I would like to proceed with what we agreed on with the first 8 houses for $25,000. Could you send me a contract on the 6 REO house and a assignment on the 2 non-performing houses. I would like to put %10 down with amortized over 25 months at %8 interest. Closing this Friday June 13th I will pay 2014 taxes, I checked Jackson county tax records and it looked like that is the only year due, but the title company will have to do a more thorough check. The contract needs to be in Tri-State Holdsings-32 LLC. Let me know your thoughts."

Other emails between Miller and Spencer indicated that Miller was researching tax records, identifying houses to purchase, transmitting money to the title company, and seeking investors other than Spencer.

Still other evidence showed that Miller had access to TSH funds. After Miller signed a consent for Landry to search his car for evidence of alcohol consumption while driving,[5] in the

---

[3]There was also evidence that Brandon did not sign all of the documents; Tony Caldwell testified that Miller routinely signed Brandon's name on TSH checks. And, probation officer Wendy Landry testified that she witnessed Brandon signing a release in her office and that his signature on that document did not match his purported signature on other documents.

[4]Bowlin declined to invest because he did not trust Miller or Caldwell, and he did not like their business plan, including that there were no real closings on the sale of the property, no appraisals and no title companies involved in the transactions.

[5]Landry sought consent to search Miller's car after she caught him in a lie about his whereabouts. Miller was not present at his residence when Landry arrived for a routine, unscheduled home visit. She called Miller and he unwittingly told her he was at home, unaware that she was at his house even as he spoke. When Miller subsequently arrived at home, Landry detected that he had consumed alcohol and administered a breathalyzer test that was just under the legal limit. Landry found no alcohol containers in Miller's car.

console area of Miller's car, Landry found Brandon's credit card.  Miller told Landry that Brandon had lost the credit card, in effect denying that the credit card was in his possession.  But Brandon later told Landry that Miller possessed the credit card to use for TSH business in Miller's capacity as a "field inspector."

In light of this strong evidence that Miller was involved in the financial affairs of TSH, contrary to his oral and written representations to Landry, and in violation of the terms of supervised release, Miller agreed to a modification of the terms of supervised release to require that he reside in a halfway house in Topeka, Kansas.  This would remove him from Kansas City and presumably remove him from his violative involvement with the operations of TSH in Kansas City.  So, on July 1, 2014, at Landry's direction, Miller was to terminate employment with TSH and cease all contact with TSH employees other than familial contact with Brandon.  And, on or about July 16, Miller moved to the halfway house.  Nonetheless, there is evidence that Miller remained involved in TSH's operations.  When he and Brandon met with probation officer Landry in August, Miller again dominated their conversation with Landry about how TSH was seeking to remedy its issues with the buyers.  Miller contributed details about the resolution with some buyers and he gave Landry a detailed description of the status of the involved properties.  Landry testified that she asked Miller to let Brandon speak.  But all Brandon contributed to the conversation was that they had "made up" with former TSH employee Tony Caldwell, who was associated with some of the buyers.

In addition to soliciting capital, controlling what properties were purchased, and otherwise controlling or directing the financial affairs of TSH, Miller collected payments from buyers or directed others to collect payments.  As discussed above, TSH personnel, including

Miller, represented to buyers and others that after buyers made their down payment of $500, they need not move in, infuse sweat equity, or commence monthly payments until TSH had completed its contractual obligation of making major repairs.  But, in practice, TSH personnel, including Miller, encouraged and even demanded that buyers move in, infuse sweat equity and make monthly payments to TSH before TSH had completed repairs, and sometimes before TSH had commenced substantial repairs.   When buyers refused to continue to make monthly payments because of TSH's failure to make major repairs, Miller, Brandon, Caldwell and others at TSH nonetheless demanded payments.

The buyers had good reason to refuse to move in or make monthly payments.  The eighteen consumer complaints filed with the Missouri Attorney General, the statements of many victims, the testimony of a few victims, and the testimony of Hoffman as well as Landry, who inspected one of the houses, all demonstrate that these houses were dilapidated and inhabitable.  Among the many deplorable conditions were: holes in the siding, walls and roofs ; no working electrical outlets; hot electrical wires; no working furnaces; broken or missing windows; leaking or inoperable water heaters; leaking and flooded basements; collapsing ceilings and floors; mold on walls and fixtures; and infestations of birds, possums and vermin.   Hoffman saw a number of these houses.  And  Landry testified that she went to the home of Treva Ford and observed that there was no lighting, a collapsing ceiling in a child's bedroom, mold on the walls and a decaying possum in a hole in the exterior siding of Ford's home.

Not only did TSH personnel, including Miller, fail to make the major repairs to these houses as the contracts required, they treated the buyers as tenants, not as buyers of the property.  Few buyers received deeds to the properties; and if they did, the deeds were never recorded.

Some buyers later lost their homes because TSH had never paid the full amount of tax delinquency at the tax sale.  When buyers failed to make monthly payments TSH personnel, including Miller threatened "eviction" and posted "eviction notices" on their doors.   Many buyers stated or testified that Miller would gain entry into their homes when they were gone, or would attempt to force his way in when they were there.  At least one buyer was effectively evicted when TSH sold his house to another buyer; both buyers Dacoda Jackson and Thomas Bowers, had keys to the house and both believed they had purchased the property.

At the revocation hearing, Miller suggested that the complainants to the Missouri Attorney General, as well as the other complaining home buyers were coached and encouraged to lie on TSH and Miller by a disgruntled, former employee of TSH, Tony Caldwell, who was fired for stealing cash payments tendered by buyers. Caldwell admittedly authored a letter to the buyers and the community disavowing and distancing himself from TSH, but Caldwell denied authorship of two other such letters.  Caldwell also admittedly counseled buyers that the proper way to seek relief was through legal remedies.  And Caldwell called Landry to report on Miller's activities.

Caldwell testified, however,  that he was not fired, but quit after he discovered TSH's unethical business practices.  Whether Caldwell was fired or quit, the evidence demonstrated that Caldwell was complicit in TSH's business practices.  Like Miller, Caldwell was a convicted felon.  Caldwell's prior convictions included a fraud conviction related to some unspecified type of real estate transaction.   Caldwell was employed by TSH to feed potential home buyers to TSH and to use his connections in the community to ostensibly help TSH with building inspectors and other city bureaucracy.  For this, TSH paid Caldwell a finder's fee of $500 per

11

contract – the entire downpayment amount– as well as ten percent of all other TSH revenue. In turn, Caldwell, also known as Bishop Caldwell, a self-described "Bishop of Community Development" steered parishioners at his church to TSH. Caldwell testified that he did not fully read the TSH contracts he encouraged his parishioners to sign, "because of the time factor." And, unlike most of the home buyers, Caldwell's church, which bought eight of the TSH houses to use for transitional housing, managed to get recorded deeds on six of the houses the church purchased.

While the Court discounts Caldwell's credibility and integrity as much as it discounts the credibility and integrity of Miller and other TSH personnel, the Court concludes that the many complaining home buyers are credible. While some of them were steered to TSH by Caldwell, others had no prior knowledge or relationship with Caldwell. In fact, some of them specifically complain about Caldwell's involvement and representations to them, and their distrust of Caldwell. Indeed, Caldwell is one of the named defendants in the civil action filed by attorney Hoffman on behalf of a group of homeowners. The Court finds that independent of Caldwell's testimony and statements, there is strong evidence of the fraudulent and unethical business practices of TSH and Miller's control of TSH's operations and financial affairs. Moreover, the contracts speak for themselves, and the condition of the many houses is uncontroverted.

**Home buyer Lisa Montgomery**

Among the many home buyers victimized by TSH was Lisa Montgomery, a small business owner who was initially distrustful of TSH's advertisements, which she saw on Facebook. Montgomery testified that she called the phone number in TSH's advertisement, spoke with Caldwell, asked him if this was a scam, and came to believe his assurances that it was

not.  Montgomery contracted to buy a house from TSH for $38,000.

Unlike many of the buyers,  Montgomery did not move into the property, relying on the contract language that required TSH to complete the major repairs before the buyer infused sweat equity or commenced making monthly payments.  Montgomery testified that while she did make some cosmetic repairs, her refusal to move into the property and make monthly payments angered Miller.  Montgomery testified that her initial dealings were with Caldwell and Brandon, such that she was suspicious in March 2014, when Miller, who identified himself as an "investor" in TSH, started calling her and demanding payment.   In April 2014, Miller called Montgomery, again representing that he was an investor in TSH and again demanding payment.  Montgomery subsequently visited the TSH office, met with Miller and Caldwell, and Caldwell demanded that Montgomery commence payments.  Montgomery in turn demanded that TSH make the major repairs, which included repairing a collapsing ceiling and replacing windows.  Miller responded that the ceiling was a cosmetic repair that Montgomery was responsible for and that TSH's only responsibility was to board up the windows, not to replace them.  Montgomery's house also had no hot water, electricity problems, a hole in the roof, and no screen or glass windows in the attic such that birds were nesting in the attic.

TSH did not make these repairs; so Montgomery continued to refuse to move in and or make payments.  Miller continued to demand payments and his behavior escalated to threats and harassment.  One day, while Montgomery was in the house checking on the state of repairs, Miller banged on her door so loud that Montgomery hid in the bathroom.  Because Miller resided in Bucyrus, Kansas with his parents at that time, and because Montgomery's house was in Missouri, Miller necessarily traveled in interstate commerce from Kansas to Missouri to

communicate these face-to-face threats to Montgomery. Miller also threatened Montgomery by phone. In June, Miller called Montgomery and threatened to "fuck her up" if she did not pay the June "rent." After this incident, Miller continued to repeatedly call Montgomery, using interstate transmission of phone calls.

On one day, Miller called Montgomery every few minutes throughout the day, using different phones so that she could not contemporaneously identify him as the source of the incoming calls. Special Agent Glaser testified that he viewed Montgomery's cell phone log and verified that many of these incoming calls were from numbers associated with Miller. The sheer number of the calls, in such a limited period of time, one day, is itself strong circumstantial evidence that Miller harassed Montgomery. At some point, Montgomery called the police. Montgomery also filed for a restraining order against Miller; but the restraining order was later dismissed for lack of service on Miller.

Montgomery further testified that after the filing of the petition for revocation of Miller's supervised release, Brandon contacted Montgomery and told her he was reducing the price of her house to $14,000 and would give her the warranty deed on the property. Brandon Miller told Montgomery that Miller had not threatened her, and asked Montgomery if she was now "good" with his father. Montgomery testified that she felt that Brandon was trying to keep her from testifying against his father.

Other buyers also reported being harassed or threatened by Miller for not making payments. Treva Ford testified about Miller's repeated threats and harassment of her for payments, which escalated into him forcing his way past her disabled mother as she stood in the front door, causing her mother to fall to the floor. And Tyler Hall, who purchased three houses

from TSH for rental investment properties, stated that although he made his monthly payments, Miller was angered that Hall had purchased the houses to rent to others. Miller demanded that Hall's tenants pay their rent directly to Miller.   Eventually Miller had the locks on Hall's houses changed, and sold at least one of the properties to someone else, even though Hall was current on his contract payments.   Hall described Miller harassing and verbally abusing him, as well.

Miller's pattern of harassment and threats also extended to Kenneth Mosley, a former TSH employee.  Mosley reported to Landry that he quit TSH after Miller verbally abused him, and after Miller tailed Mosley's car home, while Mosley had his granddaughter in the car.  Mosley also filed for a restraining order.

The Court finds Montgomery's testimony credible, and corroborated by the testimony and statements of others who suffered threats and harassment from Miller.  Although Miller suggests that these accounts are fabricated and the product of Tony Caldwell's vendetta against Miller, the Court finds that Montgomery and Ford were not coached or encouraged by Caldwell to lie.  In fact, Montgomery and Ford, among others, did not have a prior relationship with Caldwell.   Montgomery testified that Caldwell demanded payment from her as well; and Ford stated that Caldwell had stolen money from Ford's aunt.  Neither Montgomery or Ford's testimony is discreditable because of association or alliance with Caldwell.

**Conclusion**

Miller violated all four of the conditions of supervised release as alleged in the petition for revocation.  First, Miller violated the special condition that he not be employed in any capacity in which he has discretionary authority over financial matters, without approval of the probation officer.  Miller violated this condition by controlling and operating TSH,  including

exercising authority over virtually all financial matters, formulating the business plan, soliciting investments, making decisions on what properties to buy and sell, and collecting payments. Secondly, Miller violated the standard condition that he answer truthfully all inquiries by the probation officer and follow instructions of the probation officer.  Miller violated this condition by making oral representations and submitting monthly reports to his probation officer, that falsely represented that he worked for TSH as a mere laborer.  Thirdly, Miller violated the standard condition that he not commit another federal, state or local crime by submitting these false monthly reports to his probation office, under penalty of perjury.  Fourthly, Miller violated the standard condition that he not commit another federal, state or local crime by traveling in interstate commerce to communicate, as well as by  using a telephone to communicate in interstate commerce, a threat of bodily harm to Lisa Montgomery , with the intent to extort money from her.    Based on these violations, and the evidence concerning these violations and related conduct, the Court revokes Miller's supervised release, and will issue a notice scheduling the sentencing hearing.

**IT IS THEREFORE ORDERED**, that Miller's term of supervised release is revoked.

Dated: November 26, 2014

 S/ Julie A. Robinson
 JULIE A. ROBINSON
 UNITED STATES DISTRICT JUDGE